KUSKIN, J.T.C.

I

The Property

These local property tax appeals concern a multi-use, multibuilding facility located in the Borough of Princeton and designated on the Borough Tax Map as Block 20.04, Lot 1. The tax years under appeal are 1992,1993 and 1994. For each of the years 1992 *74 and 1993 the total assessment was $13,137,800, and for 1994 the total assessment was $13,226,000.
The property, which comprises office, retail and apartment components, an indoor parking garage and rights to build ninety-seven additional residential units, is located at the northern end of Palmer Square, the central commercial district of the Borough. Palmer Square extends from Nassau Street on the south to Paul Robeson Place on the north, and from Chambers Street on the west to Witherspoon Street on the east. The subject property is bounded by Paul Robeson Place on the north, Huffish Street on the south and Chambers Street on the west. The eastern boundary is approximately 100 feet west of Witherspoon Street. Huffish Street is located one long block north of Nassau Street, and is connected to Nassau Street by Palmer Square East and Palmer Square West which bisect Palmer Square. Nassau Street is the focal point of this commercial district. Princeton University is located along, and immediately to the south of, Nassau Street across from Palmer Square.
The Palmer Square area (including Nassau Street) is a separate retail and office submarket within the general Princeton market, which includes the Route 1 corridor. Palmer Square retail stores compete primarily with shopping centers on Route 1 and the Princeton Shopping Center (which is located in adjoining Princeton Township). The Route 1 corridor contains substantial office space which, in general, is not in competition with the office space in Palmer Square because of the nature of the tenant market. Major corporate tenants seeking space in Route 1 office parks are not interested in locating in the Palmer Square area. Tenants of Palmer Square office space are generally service and professional organizations which have a particular relationship with the Borough or the University.
The subject property contains 4.439 acres of land and includes four buildings, designated 5, 17, 29 and 47 Huffish Street, respectively. The office component consists of 70,771 square feet, with approximately 62,000 square feet located in 47 Huffish Street (also called 100 Palmer Square) and the balance located on the second *75 floor of 17 Hulfish Street. Office tenants also use 4,555 square feet of basement storage area. The retail component consists of 34,775 square feet, with 30,226 square feet located on the ground floors of 5, 17, 29 and 47 Hulfish Street and 4,549 square feet located on the second floor of 29 Hulfish Street. All retail space fronts on Hulfish Street. The seventeen apartment units are located above the office space in 17 Hulfish Street (9 units) and above the retail space in 5 Hulfish Street (4 units) and 29 Hulfish Street (4 units). The parking garage contains 421 spaces and has entrances on Hulfish Street, Chambers Street and Paul Robeson Place. The ninety-seven additional residential units, if built, would be located on the roof of the parking garage and on a landscaped area between the two sections of the garage.
Construction of the subject improvements occurred from 1988 through 1990 and was financed by a construction mortgage loan from The Bank of New York (“BNY”), the parent corporation of plaintiff Hull Junction Holding Corp. (“HJHC”). By August 1991 this loan was in default, and HJHC took possession of the property. On October 16, 1991 HJHC acquired title by Sheriffs Deed after an uncontested foreclosure.
At the time of foreclosure, the condition and operation of the property reflected poor management. Leasehold improvements for existing tenants remained incomplete as did building lobbies, construction of a central plaza area facing Hulfish Street and construction of a portion of the seventeen residential units. Fencing at the rear of the property was damaged, and construction debris had not been removed. Tenants were complaining about the incomplete construction items, lack of cleanliness at the property, lack of upkeep of common areas and inadequacies in the heating, ventilating and air conditioning systems. Some tenants refused to pay full rent or any rent at all. Approximately 35% of the office and retail space was vacant and the apartments were approximately 60% vacant.
By April 1992 most of the foregoing problems were resolved and some leases had been renegotiated. Existing tenants were paying rent, the property was competently managed and a leasing pro *76 gram was in effect. Vacancies, however, remained at approximately 35% for office space, approximately 30% for retail space and approximately 60% for the apartments. Commencing April 30,1992, a brochure offering the property for sale was distributed to prospective purchasers. In July 1992 a Contract of Sale was signed for a price of $18,400,000, and, pursuant to the Contract, title was conveyed to plaintiff PSN Partners, L.P. (“PSN”) on September 30,1992.

II

Valuation Methodology

Although the subject property constituted one tax lot on the Tax Map of the Borough for each of the years under appeal, the Borough Assessor allocated the assessment among multiple line items. The office and retail segments of each building were combined and assigned a separate assessment by building. Although the seventeen apartment units were part of three of the buildings containing office and retail space, each apartment was assigned a separate assessment. The parking garage was a separate line item, and the ninety-seven rights to build were combined into another line item.
The appraisers for plaintiffs and defendant valued the property in a manner generally consistent with the assessment line items.[1] Plaintiffs’ appraiser determined a combined value for the office and retail components, while defendant’s appraiser segregated these components. Both appraisers valued separately the parking garage, the seventeen apartment units and the ninety-seven rights to build. Defendant’s appraiser aggregated his component values to determine the overall value of the property as one economic unit. Plaintiffs’ appraiser concluded that the value of the property as one economic unit was less than the aggregate of his component values even though, in determining his values for the income-producing components (ie., all components other than the ninety- *77 seven rights to build), the appraiser selected capitalization rates which reflected the complex multi-use nature of the property.
The major difference between plaintiffs’ expert’s “one economic unit” value and his aggregate component value was his conclusion that the ninety-seven rights to build, which he appraised at almost $2,000,000 as a component, contributed no value when the property was viewed as a single economic unit. The expert’s “one economic unit” value for the components of the property other than the rights to build was 3.6% lower than his aggregate 1992 value for such components and less than 1% lower than his 1993 and 1994 aggregate values for such components. In context, this difference could be the result of arithmetic rounding, and, in any event, is relatively insignificant.
There is no credible basis for the expert’s opinion that the ninety-seven rights to build would contribute a value of nearly $2,000,000 when viewed separately and no value when viewed as an element of a unitary property. An investor would attribute the same value to these rights to build whether the investor analyzed the rights as a discrete component of a multi-use property or as an unsegregated aspect of an integrated economic unit. The highest and best use of the rights to build would be the same whether the rights were viewed separately or as part of the whole. Actual construction of ninety-seven units would be no more speculative under one analysis than the other.
Because of the multi-use, multi-building character of the subject property, and because of the unavailability of multi-use, multi-building comparable properties from which to derive relevant data, the appropriate methodology for valuing the property is on a component-by-component basis, including a value for the ninety-seven rights to build. This methodology applies even though, as discussed infra in Section IX, the property constituted one economic unit and one tax lot for assessment purposes. See City of Newark v. West Milford Tp., 9 N.J. 295, 303, 88 A.2d 211 (1952) (permitting valuation of a very large property through analysis of “smaller comparable holdings” in the absence of sales *78 of properties comparable in size to the subject property). It is, of course, necessary to “make sure that the sum of the separate use values does not exceed the value of the total property.” Appraisal Institute, The Appraisal of Real Estate 293 (10th ed. 1992).
In valuing the income producing components of the property, that is, the office area, retail area, parking garage and seventeen apartments, both appraisers used the income approach. Defendant’s expert also used the cost approach as a secondary basis and support for his income approach valuation of these components, and used the sales comparison approach as a test of the reasonableness of his value for the office and retail components developed through use of the income and cost approaches. Both experts used only the sales comparison approach to value the rights to build ninety-seven residential units. Although not a basis for their expert’s valuation analysis, plaintiffs also relied on the sale of the subject property as demonstrating that the assessments on the property were excessive.
The parties stipulated the following facts:
1. For all years under appeal, the economic rent for the office component was $25 per square foot inclusive of storage area;
2. The value of the seventeen apartment units was $3,317,700 for tax year 1992 and $2,100,000 for tax year 1993;
3. For tax year 1994, the gross potential income of the apartment units was $328,320 and operating expenses were $73,798.
In valuing property for tax assessment purposes, the court should consider a sale of the subject property because such sale “may be indicative of the true value of the property,” Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 282, 491 A.2d 1247 (1985), and should otherwise use that methodology which reflects the actions of the market. City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 551, 189 A.2d 702 (1963) (noting that “the inquiry relates to what investors in property of this kind in fact do demand and do obtain in deals with willing sellers”). Accord Glen Wall Assocs., supra, at 278-79, 491 A.2d 1247. With the exception of the ninety-seven rights to build, the property was income- *79 producing, and its value in the marketplace was a function of its income stream. This is confirmed by the Investment and Sales Brochure prepared in connection with efforts by plaintiff H JHC to sell the property (see discussion infra in Section III) and by the Confidential Private Placement Memorandum prepared in connection with the formation of plaintiff PSN, the partnership which purchased the property. Both such documents analyzed the property in terms of its income-producing potential. The income approach is, therefore, the proper method for determining the value of the office, retail, parking garage and apartment segments. University Plaza Realty Corp. v. City of Hackensack, 12 N.J.Tax 354, 366 (1992), aff'd, 264 N.J.Super. 353, 624 A.2d 1000 (App.Div.), cert. denied, 134 N.J. 481, 634 A.2d 527 (1993); Shav Assocs. v. Middletown Tp., 11 N.J.Tax 569, 578-79 (1991); The Appraisal of Real Estate, supra, at 409. The sales comparison approach reflects how the market would view the ninety-seven rights to build and, therefore, is the proper valuation approach for such rights.
The cost approach of defendant’s expert not only does not reflect the realities of the market, but also is an unreliable indicator of value. The expert accepted, as an accurate statement of the reproduction cost of the office, retail and parking garage improvements, costs which were included in an appraisal report prepared for BNY by Cushman & Wakefield valuing the property as of August 2, 1990. These “costs” were actually BNY budget amounts contained in what appeared to be attachments to a request or requests submitted to BNY for loan advances under the construction mortgage loan. No proofs were presented as to the methodology or sources used by BNY in establishing its budget, as to the date the budgeted costs were determined or as to trending of the budgeted costs from the budget preparation date to the applicable assessing dates. The budgeted costs included a “Developer’s Fee” which may be duplicative of the 10% developer’s profit added by the expert. Furthermore, the BNY construction mortgage loan balance, including accrued and unpaid interest, was, at the time of foreclosure, in excess of $48,000,000, an amount approximately double defendant’s expert’s value for the *80 office, retail and garage segments of the subject property. This alone suggests excessive construction costs. As a result, the BNY budget is highly suspect, and the cost information derived from it and used by the expert is of little assistance to the court. See Beneficial Facilities Corp. v. Peapack & Gladstone Bor., 11 N.J.Tax 359, 375 (1990), aff'd, 13 N.J.Tax 112 (App.Div.), certif. denied, 130 N.J. 397, 614 A.2d 619 (1992) (rejecting the expert’s construction cost estimates due to their lack of reliability, and verification). The expert’s 1994 cost approach for the seventeen apartment units is of no more assistance. This approach was based upon unit reproduction costs derived from Marshall Valuation Service, but the expert provided only minimal information as to the basis for selecting such unit costs and gave no consideration to the effect on costs of the location of these units above retail and (as to one building) office uses. Accordingly, I reject the expert’s cost approach as to all components of the property.
I also reject defendant’s expert’s sales comparison approach as to the retail and office segments. The expert utilized comparable properties varying in age from twenty-six to fifty-eight years, in size from 4252 square feet to 27,326 square feet, in height from one to four stories, in on-site parking facilities from none to sixty-five spaces in an underground garage and in highest and best use from office to office/retail. The actual use of all of the comparables appears to have been solely for office with no retail. The expert’s failure to address and adjust for these factors renders his sales comparison approach virtually meaningless. See The Appraisal of Real Estate, supra, at 371-74 (discussing the units and elements of comparison and the necessity for adjustments in the sales comparison approach). Even for the limited use “to test the reasonableness” of the expert’s combined retail and office value, the approach is unreliable.
Both appraisers, in their income approaches to value, developed capitalization rates using the Band of Investment technique. This technique is a form of “direct capitalization” which is used “to convert a single year’s income estimate into a value *81 indication.” Id. at 467. The technique includes both a mortgage and an equity component.
The overall [Band of Investment] capitalization rate must satisfy both the mortgage constant lie., the annual debt service, expressed as a percentage, necessary to amortize the mortgage over a specified term at a specified interest rate] requirement of the lender and the pre-tax cash flow requirement of the equity investor.
lid. at 471.]
Plaintiffs’ appraiser relied solely on this technique. Defendant’s appraiser described the technique as “antiquated” and relied primarily upon the Akerson Format, a version of the Ellwood Approach, for determining his capitalization rates.
Defendant’s appraiser also considered capitalization rate data published by Real Estate Research Corporation. This data was national only, with no segregation by property location or size of investment. The data reflected substantial discrepancies between the rates shown for different types of the same category of property. For example, for the third quarter of 1991, in the Retail category, the going-in capitalization rate for regional shopping centers was 7.6% and for community/neighborhood/power shopping centers was 9.4%. The appraiser relied upon the regional shopping center data, but the retail component of the subject property does not fit neatly into this category. Because the Real Estate Research Corporation data is so generalized and because of the significant differences between rates shown for different types of the same category of property, the data, as an independent indicator of capitalization rates, provides little assistance to the court and I will accord it little weight.
The Akerson Format “substitutes an arithmetic format for the algebraic equation in the Ellwood formula.” Id. at 518. The Ellwood Approach is a form of “yield capitalization” which is used “to convert future benefits into present value by ... applying an overall rate that explicitly reflects the investment’s income pattern, change in value, and yield rate.” Id. at 508. The Approach includes a mortgage factor (using a mortgage constant as does the Band of Investment technique) and an equity yield factor (as distinguished from the equity dividend factor used in the Band of *82 Investment technique). An equity yield rate is “[a] true annualized rate of return on equity capital including (in addition to the average annual dividend) the full effect of any gain or loss from resale at the termination of the investment . . . .” Charles B. Akerson, Capitalization Theory and Techniques, 189 (Appraisal Institute 1991); see also The Appraisal of Real Estate, supra, at 415 (defining yield rate). An equity dividend rate “reflects the relationship between a single year’s pre-tax cash flow expectancy and the equity investment,” The Appraisal of Real Estate, supra, at 415, and is alternatively described as the “cash on cash” rate. Akerson, supra, at 139.
In order to utilize the Ellwood Approach, the appraiser must determine an appropriate holding period for the property, calculate the equity build-up resulting from mortgage amortization over the holding period, and determine a rate of appreciation or depreciation in value over the holding period. A sinking fund factor is used to calculate the annual percentage of equity build-up and appreciation or depreciation over the holding period. This sinking fund factor reflects “the amount per period that will grow to one dollar at a given rate in a given period of time,” Akerson, supra, at 147, and is, therefore, a function of the equity yield rate and the holding period. Because a capitalization rate expresses only “the relationship between a single year’s net operating income expectancy and the total property price or value,” The Appraisal of Real Estate, supra, at 415, the Ellwood Approach requires the subtraction of the annual percentage components relating to equity build-up and appreciation in value (and addition of a percentage reflecting depreciation in value) in order to arrive at a capitalization rate.
In using the Ellwood Approach, as in using the Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing “reliable market data ... to the court as the basis for the expert’s opinion so that the court may evaluate the opinion.” Glen Wall Assocs., supra, 99 N.J. at 279-80, 491 A.2d 1247. For these purposes, the Tax Court has accepted, and the *83 Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance. Id. at 277-81, 491 A.2d 1247. Relevant data is also collected and published by the Appraisal Institute, Real Estate Research Corporation and Korpacz Real Estate Investor Survey. Excerpts from this data are included in the reports submitted by both appraisers. By analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers.
Support for the other elements of the Ellwood Approach, namely the equity yield rate, the holding period, and the appreciation or depreciation in value over the holding period, is far more problematic. The only data used by defendant’s expert in support of his equity yield rate consisted of ranges of rates throughout the United States by property type, without any breakdown by geographical location or size of investment. The expert provided no data in support of, or as a basis for, his assumptions as to holding period and appreciation in value.
The Ellwood Approach, is a version of discounted cash flow analysis.
Although the Ellwood formula is essentially a way to solve a discounted cash flow problem, Ellwood simplified the discounting procedure by publishing tables of precalculated rates that could be combined into a representative overall capitalization rate.
[The Appraisal of Real Estate, supra, at 423.]
A discounted cash flow analysis was specifically rejected by the Tax Court in University Plaza, supra.
The DCF [Discounted Cash Flow] method is an assumption-laden approach to estimating the present value of future benefits. It presupposes a measure of reliability in the projection of cash flows over a significant span of years. It also assumes the reasonable accuracy of vacancy rates, expenses, the discounted value of the reversion at the end of the projection period, the capitalization rate applied to the reversion in the first instance and, finally, the discount rate assigned both to the cash flow projections and the reversion.
. . . . As one distinguished commentator has declared: Although DCF analysis has been misunderstood and unfairly criticized, there is nevertheless a tendency to attach undue weight to the results. Perhaps this is because the neatly printed computer printouts give the appearance of accuracy and proof. In reality, the *84 results of DCF analysis can be no more accurate than the appraiser’s input. Because countless different combinations of numbers representing rates, time, and cash flow in the equation of value can point to the same final value, it is difficult to imagine that any single combination of numbers could serve as proof of value. DCF analysis as used in the appraisal process should therefore be viewed as simply another means of estimating and explaining value from an investor’s point of view, but DCF analysis should not be viewed as a means of refining or proving value.
The DCF method, as applied to tax valuation proceedings, is an amalgam of interdependent, attenuated assumptions of limited probative value. Whatever may be its utility in other contexts, its use in this case can only be described as an exercise in financial haruspication.
[iUniversity Plaza, supra, 12 N.J.Tax at 366-68 (citations omitted).] [2]
The reliability of the discounted cash flow analysis, and thus the Ellwood Approach, has also been questioned in the context of hotel valuation.
Even with good data and support, estimating a hotel equity yield rate is a subjective process based largely on judgment. On the other hand, the estimate of a hotel mortgage interest rate can be well documented using ... published life insurance industry data. Although an element of subjectivity remains, the value of the mortgage component is largely objective. Thus the capitalization technique produces results that are approximately 75% objective and 25% subjective. In contrast, a 10-year forecast using a discount rate produces results that must be considered largely subjective and do not reflect the investment analysis procedures currently used by typical hotel buyers.
[Stephen Rushmore, Hotels and Motels: A Guild to Market Analysis, Investment Analysis and Valuations 234 (Appraisal Institute 1992).]
Defendant’s expert’s opinion that the Ellwood Approach reflects the thinking of investors in determining market value is without any support in his appraisal or otherwise. This Approach was rejected by the Tax Court in Middlesex Builders, Inc. v. Old Bridge Tp., 1 N.J.Tax 305, 311-13 (1980) because “the assessor failed to demonstrate that actual investors would use this method to determine value.” Id. at 313. The Band of Investment tech *85 ñique, by contrast, has consistently been accepted by the Tax Court as an appropriate and reliable basis for determining market capitalization rates. See, e.g., Glen Pointe Assocs. v. Teaneck Tp., 10 N.J.Tax 506, 520-21 (1989), aff'd, 12 N.J.Tax 127 (App.Div.1991) (applying the Band of Investment method to determine the capitalization rate). This methodology is not perfect. Indeed, the technique includes implicitly some of the investor assumptions which are explicitly analyzed in the Ellwood Approach. “[A] satisfactory rate of return for the investor and recapture of the capital invested are implicit in the rates or factors applied in direct capitalization because they are derived from similar investment properties.” The Appraisal of Real Estate, supra, at 467. Each of the explicit components of the Band of Investment, however, can be analyzed in terms of published market data from several independent reliable sources, and this analysis engenders a reasonable level of confidence in a rate developed by this technique. Such is not the case with respect to the equity yield rate, the holding period and rate of appreciation or depreciation utilized in the Ellwood Approach.
[Y]ield capitalization methods are all based on the assumption that meaningful forecasts of income and value can be made and that an appropriate yield rate can be ascertained. They are obviously hazardous. Although they might be used to estimate market value in the absence of certain market data, they are more applicable in making investment value decisions, where the objectives of a specific investor are being considered, or in estimating the probabilities of obtaining specific yields through the analysis of market capitalization rates.
[Capitalization Methods & Techniques: An Educational Memorandum of American Institute of Real Estate Appraisers 15-16 (1979) ].
Accordingly, I will rely on the Band of Investment technique for determination of the appropriate capitalization rates.
In summary, in valuing the subject property for property tax purposes, I will (i) consider the sale of the property, (ii) utilize the income approach with respect to the office, retail, parking garage and apartment components, developing capitalization rates using the Band of Investment technique, and (iii) utilize the sales comparison approach with respect to the ninety-seven rights to build.

*86
III

The Sale of the Property

In order to determine the reliability of the sale of the subject property on September 30,1992 (pursuant to a Contract of Sale dated July 24, 1992) as an indicator of fair market value, the background of the sale must be analyzed.
In August 1991, HJHC, BNY’s wholly-owned subsidiary, took possession of the property and immediately engaged SNE Asset Management Co., Inc., an affiliate or subsidiary of The Sammis Company (which later became Gale & Wentworth, Inc.) pursuant to a Property Management Agreement dated August 23, 1991. Under Section 1.2 of this Agreement, SNE Asset Management Co., Inc. had three general areas of responsibility:
A. seeking tenants for the leasable portions of the property;
B. managing the property; and
C. marketing the property for sale and preparing appropriate promotional literature and programs.
SNE Management Co., Inc., The Sammis Company and Gale and Wentworth, Inc. are hereafter referred to as “G & W.”
BNY never had any intention of retaining the property as an investment. BNY’s objectives upon obtaining title were to “stabilize” the property and sell it in an expeditious manner. BNY’s primary motivation was to reduce the non-performing assets shown on its balance sheet. BNY’s 1991 Annual Report noted “considerable progress in improving the quality of our balance sheet by increasing loan loss reserves, reducing the level of nonperforming assets and strengthening our capital base” and described a 31% reduction in commercial real estate non-performing assets “through charge-offs, writedowns and the sale of 25 foreclosed properties.” BNY’s 1992 Annual Report emphasized that “[throughout 1992 the company continued to pursue its objective of driving down non-performing assets” through the sale of properties “plus a combination of write-downs and charge-offs.” Consistent with the procedures described in its Annual Reports, in *87 October 1991, BNY wrote down to $28,000,000 the approximately $48,000,000 balance in default under the construction mortgage loan encumbering the subject property. Such write-down was apparently based on an appraisal prepared for BNY by Cushman & Wakefield. As described by the review appraiser for BNY (a vice-president of the Bank and a Member of the Appraisal Institute), this appraisal, which excluded the seventeen apartment units and ninety-seven rights to build,
concluded that the current Market Value of the leased fee interest in the commercial space as of August 2, 1990 is $27,000,000. Furthermore, they estimate the Market Value of the leased fee interest upon stabilization (lease-up) anticipated to be January 1, 1992 is $28,500,000. The Present Market Value of the fee simple interest in the garage as of August 2, 1990 is estimated to be $2,500,000.
The process of stabilizing the property to the satisfaction of BNY and G & W was completed by early Spring 1992. This process included restructuring and renegotiation of existing leases, completion of tenant fit-up work, completion of common areas, particularly the central plaza facing Hulfish Street, completion and improvement of interior lobbies, and completion of the seventeen residential units. In April 1992, BNY decided to proceed with the sale of the property notwithstanding that the New Jersey commercial real estate market was then severely depressed and the office and retail segments of the subject property had not yet achieved their projected long term occupancy levels of 90-95%. At BNYs instructions, G & W undertook formal efforts to market the property for sale. These efforts took into account (i) marketing difficulties resulting from the perception of the property as a failed project and (ii) the limited number of investors who would consider purchasing property containing office, retail, parking garage facilities, and residential components. In light of these factors, the marketing program did not include newspaper or trade journal advertising or listing with real estate brokers. The program initially consisted of contacting those prospects who, before BNY acquired title, communicated to BNY interest in acquisition of the property and contacting 100-150 institutional and local investors and property developers selected by G & W based upon its knowledge of the market and input from BNY and *88 real estate brokers. These efforts produced expressions of interest from thirty-two prospective purchasers.
A second aspect of G & Ws marketing program was preparation of a sales brochure for distribution to the thirty-two prospects. By the end of April 1992, a highly professional Investment and Sales Brochure (the “Brochure”) was completed. This document included a description of each of the components of the property, financial summaries and projections, and characterized the property as favorably as possible (containing a “creative marketing spin”) in terms of both the property’s condition and its potential for producing increased income.
The Brochure contained an asking price of $22,000,000, substantially below the Cushman & Wakefield appraisal which BNY had used to justify the loan write-down but which BNY consciously disregarded (as based on incorrect information) in setting the asking price. The asking price reflected the financial analysis, particularly the income projections, contained in the Brochure as well as the discussion in the Brochure of two “Value Added Opportunities.” One such Opportunity was the additional rent which would be realized from leasing vacant space at the property (including approximately 20,000 square feet of office space and 12,000 square feet of retail space). The Brochure assumed that stabilized “full” occupancy of 90-95% of the office and retail space would occur by the end of 1993. The other Opportunity was the right to construct ninety-seven additional residential units above and adjacent to the existing parking garage.
BNY and G & W recognized that the asking price was too large for local investors to consider and too small to interest institutional investors. BNY and G & W also recognized that the real estate market was severely depressed and that deferral of disposition efforts until stabilized office and retail occupancy levels were attained would permit a higher asking price and might produce a higher sales price. They understood that a purchaser would be likely to pay more if: (i) the property could be acquired without assuming the risk that the property would not attain the projected stabilized occupancy levels, and (ii) the purchaser would not be *89 required to undertake the expenditures required to reach such levels. BNY determined, however, that the investment required to achieve the projected stabilized occupancy levels (approximately $1,000,000 to $1,500,000 for tenant improvement work, brokerage commissions, and repair and upgrading of the parking garage) was not warranted by the potential increase in sales price. Furthermore, selling the property was consistent with BNY’s “objective of driving down non-performing assets” even though, under applicable banking regulations, BNY was not required to dispose of the property for five years after acquisition. BNY elected, therefore, to sell the property in its condition as of late April — early May 1992.
Commencing April 80, 1992 and continuing until mid-July 1992, G & W transmitted the Brochure to the thirty-two prospects and received approximately eight responses indicating further interest. One such response was from Mr. Oded Aboodi who had been an investor in Hulfish North Limited Partnership, the original developer (and defaulting mortgagor) of the property. Mr. Aboodi’s discussions and negotiations with BNY, which had commenced before BNY acquired title and continued for approximately six months, culminated in a purchase offer of $18,400,000. During the course of the negotiations with Mr. Aboodi, G & W received other offers ranging from $11,000,000 to $16,000,000.
On July 24,1992, less than three months after the Brochure was transmitted to most of the prospective purchasers (and less than two months as to five prospects) and before several prospective purchasers had completed their review of the Brochure and the property, HJHC entered into a Contract of Sale (the “Contract”) with G.A. Properties, Inc., an entity formed by Mr. Aboodi. The Contract contained extraordinary provisions which can be explained as demonstrating either BNYs strong motivation to sell the property or the weakness in the real estate market which required unusual concessions in order to effect a sale. It is impossible to determine which of these explanations is the more accurate one; the likelihood is that the unusual provisions are a *90 reflection of both BNYs motivation and market conditions. The following is a discussion of these Contract provisions.
A. Article 2(a)-(c) provided a ninety-day due diligence period for the purchaser, even though Mr. Aboodi was familiar with the property and its financial results except, perhaps, for the period between August 1991 and April 1992. Under paragraph (c), if, after conducting inspections and investigations of the property and its books and records, the purchaser was not satisfied with the results, the purchaser was not bound by the Contract. The purchaser had, in effect, a ninety-day purchase option.
B. Article 3.1 provided for a cash deposit of $368,000 which represented 10% of the cash portion of the price and 2% of the total purchase price. A more customary deposit of 5% to 10% of the total purchase price would have been $920,000 to $1,840,000. Cf. Krupnick v. Guerriero, 247 N.J.Super. 373, 377, 379-80, 589 A.2d 620 (App.Div.1990) (citing cases where deposits from 7% to 18% were held to be reasonable measures of damages resulting from buyers’ defaults).
C. Article 3.2(b) obligated the seller to grant a non-recourse purchase money mortgage loan in the amount of $14,720,000 with terms differing in four respects from “market” terms. Firstly, the loan represented 80% of the purchase price. Data compiled by the American Council of Life Insurance (“ACLI”) indicates that mortgages on commercial properties during the third quarter of 1992 generally did not exceed 70% of value. Plaintiffs’ appraiser, in his income approach, utilized a “market” mortgage ratio of 75% and defendant’s appraiser used 70%. Secondly, the interest rate was well below going market rates at the time. The Private Placement Memorandum (the “PSN Memorandum”), distributed to prospective investors in connection with the formation by Mr. Aboodi of plaintiff PSN, described the interest rate as of the date of closing of the loan as approximately 4.8%. The ACLI data indicated prevailing interest rates on loans secured by mortgages on commercial properties in the third quarter of 1992 of approximately 8.5% to 9%. The appraisers for the parties used mortgage interest rates ranging from 8.25% to 9.5%. The Contract provided *91 that the mortgage interest rate was subject to periodic adjustment, but, at least during the first half of the loan term, the rate was likely to remain low relative to the market. Thirdly, the loan required no amortization of principal for seventeen months and thereafter only in amounts equal to one half of cash flow unless the lender, whose consent could not be unreasonably withheld, permitted use of such cash flow for capital expenditures. Fourthly, the mortgage note provided that, if the loan was prepaid within ninety days, there would be a $1,400,000 discount in the principal balance so that the loan could be fully satisfied by a payment of $13,320,000.
D. Article 4.1 provided for a closing date of August 20, 1992, but permitted the purchaser to extend that date to September 11, 1992 if, as of August 20, the purchaser had not received approvals required from various state attorneys general in order to offer for sale interests in a partnership which would acquire the property. The Article further provided that, if the approvals were not obtained by the adjourned date of September 11, the purchaser had the right to terminate. There was no requirement that the purchaser make diligent efforts to obtain the approvals.
E. Article 4.8 provided that, if the purchaser obtained approval to purchase the liquor license for the property, the seller funded the $250,000 purchase price. If the approval was not obtained, the seller paid the purchaser $250,000 as a post-closing adjustment. The seller also was obligated to pay the purchaser the unused portion of a $210,000 tenant improvement allowance for premises then leased to the Canton Grill if this tenant terminated its lease because of failure to obtain the liquor license.
F. Article 9.9 obligated the seller to complete tenant improvement work at a cost of $596,277 and pay $258,680 for brokerage commissions.
Upon closing of title on September 30, 1992, BNY wrote off the approximately $10,000,000 difference between the sales price and the previously written down loan balance of $28,000,000. Simultaneously, the purchase money mortgage loan of $14,720,000 was *92 placed on BNYs books as a performing loan, thus improving the BNY’s balance sheet.
The expert witnesses interpreted the foregoing facts in opposite manners. Plaintiffs’ appraiser, as well as Mr. Aboodi and Stephen Lapham, a vice president of BNY, testified that the purchase price of $18,400,000 represented fair market value for the property or, perhaps, a price in excess of fair market value because of the favorable financing. Mr. Aboodi testified that he regarded the cash price for the property to be $17,000,000 ($18,400,000 minus the $1,400,000 discount obtainable by payment of the mortgage loan within ninety days).
Defendant’s expert concluded that the purchase price was not reflective of fair market value because: (i) BNY was willing to accept a lower than market price in order to replace a nonperforming asset on its balance sheet with a performing loan; (ii) the office and retail occupancy levels at the property at the time of the sale were significantly below stabilized levels; (iii) the rental projections in the Brochure were significantly below rents then existing and thereafter realized at the property, and significantly below both appraisers’ estimates of economic rents, resulting in an asking price which was too low (and which limited the ultimate sales price) and causing concern among potential purchasers even if each purchaser performed an independent financial analysis of the property; and (iv) the property was not exposed to the market for an adequate period of time.
The expert adjusted the purchase price by determining the additional income which would have been realized from stabilized occupancy levels of 90% for the office space and 95% for the retail space as compared to the actual occupancies (70% of office space and 65% of retail space) at the time the Contract was signed, and from increased garage occupancy resulting from higher building occupancy. He then capitalized this “additional income” producing $10,300,000, which he added to the sales price of $18,400,000, resulting in an adjusted price of $28,700,000.
Defendant’s expert made a further adjustment for marketing time. This adjustment assumed that the sales price, as already *93 adjusted for additional rental income, represented only the present value of the price which would have been obtained had the property been exposed for sale for the eighteen months which the expert determined to be an adequate marketing period. The expert thus divided $28,700,000 by a present value factor, which produced a fully adjusted sales price of $34,100,000.
Defendant’s expert also analyzed the difference between the office and retail rents projected in the Brochure and the economic office and retail rents utilized by both appraisers, and the difference between such projected rents and actual rents. Capitalizing this difference produced $6,800,000, which, when added to the actual price of $18,400,000, produced an adjusted sales price of $25,200,000. Applying the expert’s marketing time adjustment would result in a fully adjusted sales price of $29,917,400.
As rebuttal to the analysis of defendant’s expert, plaintiff presented a second appraisal expert (“plaintiffs’ sale expert”), whose report and testimony were limited to the reliability of the sale by HJHC to PSN as an indicator of fair market value. This appraiser rejected the adjustments by defendant’s appraiser on two grounds: (1) the adjustment for additional rental income erroneously assumed that the purchaser believed stabilization at 90% to 95% occupancy would never occur, and, therefore, the purchase price was uninfluenced by “upside potential;” and (2) the marketing period for the property was fully adequate given the nature of the property, the relatively small group of prospective purchasers and general economic conditions at the time. Plaintiffs’ sale expert did not analyze or respond to the adjustment by defendant’s expert for the difference between the rents projected in the Brochure and actual or economic rents.
Plaintiffs’ sale expert determined that BNY was under no regulatory time constraint or financial pressure to sell the property, and concluded that BNY would not knowingly and intentionally have sacrificed a substantial increase in the price which could have been realized by retaining ownership for a short additional period and making a relatively modest investment of capital. In this expert’s opinion, the sales price of $18,400,000 bore a reasonable *94 relationship to the income projections in the Brochure and PSN Memorandum and represented fair market value for the property in its condition at the time of sale, given the then depressed condition of the general real estate market. Plaintiffs’ sale expert further concluded that the price may have represented more than fair market value because of the influence of the favorable 80% purchase money mortgage financing provided by the seller. The expert did not quantify this increment to the sales price.
As a general principle, the sale of a subject property “is not dispositive on the issue of value.” Glen Wall Assocs., supra, 99 N.J. at 282, 491 A.2d 1247; see also Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162-68, 65 A.2d 828 (1949) (finding that selling price is “merely evidential” and the court must weigh “all component factors and, adventitious circumstances”). Such a sale is, however, a reliable indicator of fair market value if the following criteria are satisfied:
1) buyer and seller are typically motivated and neither is under duress;
2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;
3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;
4) the purchase price is paid in cash or its equivalent; and
5) the purchase price is unaffected by special or creative financing or by other special factors, agreements or considerations. The Appraisal of Real Estate, supra, at 18-22; Appraisal Institute, The Dictionary of Real Estate Appraisal 222-23 (3d ed. 1993).
Although the sale satisfied criteria (2) and (4), it did not satisfy criteria (1), (3) and (5). As to criterion (1), the seller was not typically motivated; as to criterion (3), BNY’s signing a contract of sale within less than three months after distribution of the Brochure commenced, while several prospects were still reviewing *95 the Brochure and the property, was precipitous given the complex nature of the property and prevailing market conditions (see discussion infra); and, as to criterion (5), the purchase price was affected by special financing as described supra in the discussion of Article 3.2(b) of the Contract, and by special factors, agreements and considerations. These special factors, agreements and considerations were the following:
1. The seller, although not under duress either as the result of applicable banking regulations or financial pressure, was unusually highly motivated to sell the property. See Whippany Assocs. v. Hanover Tp., 1 N.J.Tax 325, 330 (1980) (finding that the seller was under a greater economic compulsion than the hypothetical willing seller). This motivation is evident from the fact that, as soon as BNY acquired title, indeed before it acquired title, it was planning for the disposition of the property and engaging in discussions with prospective purchasers. Furthermore, the sale of the property was part of BNY’s program of “driving down non-performing assets.” This motivation is significant even though the impact on BNY’s balance sheet of the removal of this particular nonperforming asset was relatively insignificant in the context of BNY’s total assets of over forty billion dollars.
2. The Brochure was unduly conservative in its rental projections. The asking price of $22,000,000 based on these projections was, therefore, unduly conservative and limited the ultimate sales price. Even though prospective purchasers would be likely to perform independent financial analyses and not rely solely on the Brochure’s projections, the rent levels contained in the projections inevitably caused concern among prospective purchasers and may have had a depressing effect on purchase offers.
3. That the seller of the property was a foreclosing mortgagee may, in itself, have negatively influenced the amounts of purchase offers because prospective purchasers took into account the strong desire of the mortgagee to dispose of the property. See id. (noting that a foreclosing bank “is generally not in the business of renting and managing real estate properties”).
*96 4. At the time the property was offered for sale and the Contract signed, occupancy levels at the property were significantly below stabilized levels and the real estate market was severely depressed (plaintiffs’ sale expert described the market as “dismal” and the president of G & W's commercial group described the market as “terrible” and 1991, 1992 and 1993 as “three of the worst years in the commercial real estate market in New Jersey in quite some time”). The combination of these temporary conditions caused a reduction in the number of investors willing to bid on the property and a reduction in the dollar amounts of the bids made. Tax assessment value should be determined on the basis of stabilized market conditions and stabilized property conditions. In Hackensack Water Co. v. Division of Tax Appeals, supra, 2 N.J. 157, 65 A.2d 828, the Supreme Court held: “Value for purposes of taxation has some measure of permanency which renders it secure against general temporary inflation or deflation.” Id. at 163, 65 A.2d 828. See also In re Appeal of East Orange, 103 N.J.Super. 109, 117, 246 A.2d 722 (App.Div.1968) (citing the importance of stability in assessments). The Tax Court has adopted and followed this precept. For example, in Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316 (1984), the court noted the “strong public interest in assessment stability and its corollary, stable, predictable municipal revenues, ...” Id. at 332. In Berkley Arms Apartment Corp. v. City of Hackensack, 6 N.J.Tax 260 (1983), the court summarized the proper approach: “[I]n view of the need for stability in taxation, our cases uniformly hold that true value of realty must be ‘fairly constant and must be gauged by conditions, not temporary and extraordinary, but by those which over a period of time will be regarded as measurably stable.” Id. at 286. If BNY had deferred its sale efforts until stabilized occupancy occurred, and invested the capital necessary to produce such occupancy, or simply waited a few months for occupancy increases anticipated by G & W in April 1992 to take effect (by the date of closing with PSN, office occupancy had increased from 70% to 85% and retail occupancy had increased from 65% to 83%), the asking price, even in a depressed market, would have been higher and, in all likelihood, the sales price would *97 have been higher. BNY explained its reluctance to invest such capital as resulting from its concern that the investment would not produce a concomitant increase in the sales price. This was the short term view of an impatient owner which had already decided to dispose of the property and, consequently, was unwilling to wait for an investment to bear fruit.
The adjustments to the sales price made by defendant’s expert do not provide an acceptable basis for disregarding the impact of the foregoing special factors, agreements, and considerations. The expert’s adjustment for increased rents generated at stabilized occupancy levels is unacceptable because it erroneously assumes that the purchase price was unaffected by the potential for increased revenues at the property. The potential for increased income resulting from leasing of vacant space was an important element of the sales marketing program. The Brochure contained projections of increased rental income as an inducement to prospective purchasers, and the PSN Memorandum contained similar projections as an inducement to investors in PSN. Both the Brochure and PSN Memorandum projected 90% to 95% occupancy of the retail and office space by the end of 1993. The extensive cautionary language in the PSN Memorandum is typical of such documents and does not detract from the significance of the revenue potential to investors.
The expert’s adjustment for increased rents is unacceptable because it assumes that increased revenue would be achieved without cost to the landlord. In capitalizing “gross” projected revenue increases, the expert improperly disregarded additional costs which would be incurred by the landlord to generate the increases. Costs for improvements to tenant space would be required and increased operating costs might result from higher occupancy levels. These costs would reduce, to some extent, the increase in revenue. The amount of this reduction cannot be calculated from the record, but it also cannot be ignored.
Defendant’s expert’s adjustment for marketing time is unacceptable because it assumes, without factual support, that eighteen months was the appropriate marketing period and further as *98 sumes, without factual support, that having the property available for purchase for such a marketing period would, in itself, have produced a higher sales price. Expert opinion unsupported by adequate facts has consistently been rejected by the Tax Court. Willow/Leonia Assocs. v. Leonia Bor., 12 N.J.Tax 338, 344 (1992); Biunno, Current N.J.Rules of Evidence, comment on R. 703 (1995). Furthermore, the expert failed to consider all factors relevant to marketing time and time of exposure to the market. See The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice 83, Advisory Opinion G-7 (1993 ed.) (stating that “[t]he reasonable marketing time is a function of price, time, use, and anticipated market conditions such as changes in the cost and availability of funds; not an isolated estimate of time alone.”); see also id. at 64, Statement on Appraisal Standards No. 6 (stating that “[t]he reasonable exposure period is a function of price, time and use, not an isolated estimate of time alone.”).
Finally, defendant’s expert’s adjustment based on excessively low rental projections in the Brochure is unacceptable because it assumes that an investor would consider all retail and office rents at the property to be at the levels projected in the Brochure. The expert ignored the probability that a prospective investor would rely upon the existing actual rents which, in most cases, exceeded the projections.
In summary, whether the $18,400,000 sales price for the subject property reflected fair market value for tax assessment purposes as of the relevant assessment dates of October 1, 1991, October 1, 1992 and October 1, 1993 is, at best, uncertain. The sale is, therefore, an unreliable indicator of such value. The adjustments made by defendant’s expert are equally unreliable. Accordingly, in determining the fair market value of the subject property, I will attach little weight to the sale.

IV

Office Valuation

In applying the income approach to the 70,771 square feet office component, the first step is to determine economic rent as of *99 the relevant assessing dates. The parties have stipulated this economic rent to be $25 per square loot for each of the tax years under appeal, which amount includes the 4555 square feet of storage area used by office tenants. Such rent is a gross rent with the landlord responsible for payment of real estate taxes out of rental income.
The next step is to determine the appropriate vacancy and collection loss factor. Plaintiffs’ appraiser used a factor of 15%, and defendant’s appraiser used 10%. The office portion of the subject property had an actual vacancy of 15% as of October 1992, 10% as of October 1993 and 9% as of December 1994. The general vacancy rate for office space in the Palmer Square area averaged 18.6% for 1992, 11.7% for 1993 and 9.2% for 1994. Defendant’s appraiser determined that the available office space in the Borough of Princeton reflected an average vacancy rate of 9.22%. General studies of vacancies in the Mercer County area and in the Princeton area as of 1992 showed average vacancy percentages in excess of 18%. The Brochure projected office vacancy as stabilizing by the end of 1993 at 5% per annum. A similar projection appears in the PSN Memorandum.
Giving primary emphasis to the experience of the subject property itself, I find that the appropriate vacancy and collection loss factor, on a stabilized basis, is 10%. See University Plaza, supra, 12 N.J.Tax at 369 (noting the importance of stability of assessments in determining the appropriate vacancy and collection loss allowance). This is twice the vacancy percentage projected by G & W in the Brochure and twice that projected in the PSN Memorandum.
The third step in an income approach is a determination of the appropriate expense deductions. The following analysis of these deductions uses the categories selected by the appraisers.
1. Management — Plaintiffs’ appraiser used 5% of effective gross income as a management fee and defendant’s expert used 4%. In light of the complex nature of the subject property, the location of the office space in two separate buildings and the differences in character and quality of the office space (the 47 Hulfish Street space being superior to that in 17 Hulfish Street), I find that 5% of effective gross income is the appropriate management fee.
*100 2. Utilities — Plaintiffs’ expert deducted a utilities expense of $159,235 for each year while defendant’s expert deducted $106,058 for each of 1992 and 1993 and $94,074 for 1994, including water and sewer. Plaintiffs’ expert noted that tenants reimbursed the landlord for office electricity at the rate of $1.25 per square foot leaving a net utilities expense to the landlord of $70,771. I find that the appropriate utilities expense is $100,000 per year.
3. Leasing Commissions — Plaintiffs’ expert utilized 5% of effective gross income for leasing commissions. Defendant’s expert assumed that only 30% of the office space would be leased to new tenants in each year and, therefore, that commissions would be payable only with respect to this portion of the space because commissions are customarily not paid in connection with renewals of office leases. Although I accept the expert’s opinion that payment of renewal commissions is not customary, I find it unreasonable to assume that 70% of existing office leases will be renewed annually and no commission will be payable as to any of these renewals. The normal leasing commission is 5% of the rent payable under a lease. I will reduce this leasing commission expense to 3% of effective gross income to account for lease renewals where no commission is payable.
4. Repairs and MaintenancelGeneral Operating Expenses — Plaintiffs’ expert established categories of expense entitled Repairs and Maintenance and General Operating Expenses, respectively. Defendant’s expert subdivided these expenses into Repairs and Maintenance, Cleaning, Payroll, Trash Removal, Security and Insurance. Plaintiffs’ expert’s aggregate expense in his two categories was $176,928 per year. The average of the total expenses established by defendant’s expert for the years 1992, 1993 and 1994 was $171,340. I find that defendant’s expert’s expense for Repairs and Maintenance is slightly understated, and, therefore, the proper amount for repairs and maintenance and general operating expenses (which include the various categories established by defendant’s expert) is $177,000 per year.
5. Tenant Improvement Allowance — Both experts deducted an amount attribute able to an annualized cost for the landlord’s performing of improvements required in connection with new leases or with renewals of leases. Such a deduction is appropriate on the theory that, whenever office space is leased, the landlord will incur this cost in order to produce the assumed economic rent.
In certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made. If this work is performed at the landlord’s expense and is required to achieve market rent, the expense of these improvements should be included in the reconstructed operating statement as part of the replacement allowance.
[The Appraisal of Real Estate, supra, at 450.]
But see RTC Properties v. Town of Kearny, 13 N. J.Tax 146, 155-56 (1993) (holding that tenant improvement costs are “capital in nature” and, therefore, not deductible as an operating expense). Plaintiffs’ expert used $1.00 per square foot for this expense and defendant’s expert used $1.10 per square foot. Both experts assumed a ten year amortization period. I will use $1.05 per square foot or $74,300 for this expense.
6. Reserves — Plaintiffs’ expert deducted an expense for reserves for structural repairs in the sum of 2% of effective gross income. Defendant’s expert used a reserve of only ten cents per square foot because of the newness of the subject *101 buildings and because some items for which a reserve would otherwise be justified were included in his tenant improvement allowance. I find that 2% of effective gross income is the appropriate reserve. Even though repairs to, or replacements of, items such as the structure and roof may not immediately be required, the property owner would be expected to reserve at a consistent level for these repairs and replacements, independent of tenant improvement costs, even during the early years of the property’s operation. See River Office Equities v. Middletown Tp., 11 N.J.Tax 404, 411-12 (1990) (finding that the use of reserves results in greater stability of assessments).
The foregoing analysis can be summarized as follows:
Gross Potential Income ($25.00 per square foot x 70,771 square feet) $1,769,275
Less Vacancy and Collection Loss Allowance (10%) $ 176,928
Effective Gross Income $1,592,347
Less expenses:
Management fee (5% of Effective Gross Income) $ 79,617
Utilities $ 100,000
Leasing Commissions (3% of Effective Gross Income) $ 47,770
Tenant Improvements ($1.05 per square foot) $ 74,310
Repairs and Maintenance/Operating Expenses $ 177,000
Reserves (2% of Effective Gross Income) $ 31,847
Total $ 510,544
Net Operating Income $1,081,803
The final step in the income approach is the determination of the appropriate capitalization rate. In their respective Band of Investment analyses for tax year 1992, both appraisers used a mortgage interest rate of 9.5% and a twenty-five year amortization period. Plaintiffs’ appraiser used a 75% loan to value ratio and defendant’s appraiser used a 70% ratio. Plaintiffs’ appraiser used an equity dividend rate of 10% and defendant’s appraiser used 4.89%. The implicit equity dividend rates in the applicable ACLI data (Tables 8, 9 and 10) for the third and fourth quarters of 1991 ranged from 5.9% to 9.47%, and the equity capitalization rates for *102 office buildings published by Real Estate Research Corporation (“RERC”) for central business district and suburban office buildings and Korpacz Real Estate Investor Survey (“Korpacz”) for the national office market for the same time periods ranged from 6.5% to 12%, with average rates ranging from 8.7% to 9.21%.[3] The RERC and Korpacz data is based upon all cash transactions. Where the cash investment, i.e., the equity investment, is only 25%-30% of the total investment, the equity dividend rate would tend to be lower than the all cash rate. Because of the condition of the subject property on October 1,1991, with high vacancy and incomplete construction items, I find that lenders and equity investors would regard an investment in the property as of such date to entail a greater degree of risk than a similar investment as of October 1, 1992 or 1993. For lenders this greater risk is reflected in a lower loan-to-value ratio and a higher interest rate, and for equity investors the greater risk is reflected in a higher equity dividend rate. For all years, of course, the components of the capitalization rate are affected by the complex multi-use nature of the subject property. I find, therefore, that for 1992, the appropriate mortgage interest rate is 9.5%, and the appropriate amortization period is 25 years, resulting in a mortgage constant [ie., the annual debt service (principal plus interest) as a percentage of the original principal amount of the mortgage loan, The Appraisal of Real Estate, supra, at 470] of 10.48%. The appropriate loan-to-value ratio is 70% and the appropriate equity dividend rate is 10%. The basic capitalization rate, therefore, is 10.34%. Because the gross rent has been used, a tax factor equal to the effective tax rate (i.e. the actual tax rate multiplied by the applicable ratio determined under N.J.S.A. 54:l-35a) must be *103 added to the basic capitalization rate. New Brunswick v. Division of Tax Appeals, supra, 39 N.J. at 545-47, 189 A.2d 702. The tax rate in Princeton for 1992 was $3.73 and the applicable Chapter 123 ratio was 49.61%. Accordingly, the effective tax rate was 1.85% so that the total capitalization rate for 1992 is 12.19%.
Plaintiffs’ appraiser used an 8.5% mortgage interest rate for tax years 1993 and 1994. Defendant’s appraiser used 8.5% for 1993 and 8.25% for 1994. For both years, both appraisers used a twenty-five year amortization period. Plaintiffs’ appraiser used a 75% loan-to-value ratio and 10% equity dividend rate, and defendant’s appraiser used a 70% loan-to-value ratio and 4.89% equity dividend rate. The Supreme Court has held that “[i]t is not feasible for an assessor to adjust the rolls to the fluctuations of the mortgage market. The rate of return should reflect conditions for a reasonable span of years.” Id. at 550, 189 A.2d 702. Accordingly, I find that for both years the appropriate mortgage interest rate is 8.5% and the appropriate mortgage amortization period is twenty-five years (producing a mortgage constant of 9.66%), and the appropriate loan-to-value ratio is 75%. For the third and fourth quarters of 1992 the implied equity dividend rates in the applicable ACLI data ranged from 7.27% to 12.57% and the RERC and Korpaez equity capitalization rates for office buildings ranged from 6.5% to 12% with average rates ranging from 9.6% to 10.33%. The data for the third and fourth quarters of 1993 is similar. After taking into consideration that the condition of the subject property had stabilized by October 1, 1992, as well as the complex multi-use character of the property, I find the appropriate equity dividend rate to be 9%. Using these factors, and an effective tax rate of 1.93% for 1993 and 2.01% for 1994, produces overall capitalization rates of 11.43% and 11.51%, respectively.[4]
*104 Applying these capitalization rates to the net income determined above produces the following values for the office portion of the subject property:
1992— $8,874,500
1993— $9,464,600
1994— $9,398,800.

V

Retail Valuation

The retail segment of the property contains 34,775 square feet, including 30,226 square feet of first floor space located in all four buildings and 4,549 square feet of second floor space located only in 29 Huffish Street. Both appraisers determined different economic rents for first floor and second floor space and applied a net lease analysis. Under a net lease, as such term is used by the appraisers, each tenant pays its proportionate share of real estate taxes and other operating costs and pays all costs for improvements and alterations required in connection with occupancy of the tenant’s premises. Plaintiffs’ expert determined the per square foot economic net rent for all three years under appeal to be $25 for the first floor space and $18 for the second floor space. Defendant’s expert determined the per square foot economic net rent for first floor space to be $27 for 1992, $28 for 1993 and $29 for 1994, and determined the per square foot economic net rent for second floor space to be $20 for all three years.
Both experts relied upon rental information from the subject property as well as comparable rentals in the Palmer Square area. Plaintiffs’ expert averaged the basic net rentals (excluding percentage rent) payable by each tenant of the subject property over the term of its lease and reviewed comparable leases in Palmer Square. The expert calculated an overall average of $26.27 per square foot for first floor space and $19.77 per square foot for second floor space. In calculating the overall average of the first floor rentals, the expert excluded rentals payable by The Gap (averaging $34 per square foot for each of two stores) and by The Nature Company (averaging $31.74 per square foot after rental *105 commenced pursuant to a February 28, 1992 Amendment to Lease). Such exclusion resulted from provisions in these leases permitting the payment of only percentage rent until at least 75% (The Gap) or 80% (The Nature Company) of retail space at the subject property was open for business. This minimum occupancy percentage was lower than the stabilized occupancy percentage of 85% used by plaintiffs’ expert. Accordingly, The Gap and The Nature Company would be paying basic fixed rent under the expert’s occupancy assumption. These leases, which encompass 37% of the first floor retail space, should have been considered in the expert’s average rental analysis. Even if the pre-minimum occupancy percentage rents are included, the per square foot rental for The Gap stores averaged $27.80 and $31.39, and the per square foot rental for The Nature Company averaged $23.79. Including these rents in the expert’s computation results in an overall average of $26.65 per square foot for first floor space. Including The Gap and The Nature Company average rentals without regard to the minimum occupancy provisions, but considering the one year rent concession granted to The Nature Company, produces an overall average rental for first floor space of $27.58.
In analyzing the subject property leases, defendant’s expert did not calculate average rentals over lease terms. He focused on the rentals payable for each of the years under appeal. The expert determined that first floor per square foot net rentals averaged $26.79 for 1991, $28.66 for 1992 and $28.98 for 1993. The expert also noted that, in December 1993 and January 1994 when the property had stabilized, leases were signed at net per square foot rentals of $30 and $28.50, respectively.
The comparable rentals in the Palmer Square area as analyzed by both experts reflected per square foot net rentals in the $30 per square foot range, although rentals for comparable properties located closer to the subject property, that is, toward the northern end of Palmer Square East and Palmer Square West, were in the $27 per square foot range. These comparables demonstrate that the location of the subject property for retail purposes is less *106 desirable than the portions of Palmer Square West and Palmer Square East closer to Nassau Street.
Both appraisers agreed that, generally, retail tenants pay all costs of improvement and alteration work (“tenant fit-up”) required in connection with occupancy of their space. In the subject property, however, the landlord was generally required to pay fit-up costs of $15 to $27 per square foot. Both appraisers analyzed these costs as if amortized over ten years, and both determined that their respective economic rental rates reflected this landlord cost. See The Appraisal of Real Estate, supra, at 450 (stating that if, in the relevant real estate market, the landlord is required to make substantial improvements in order to generate market rent, the expense of such improvements should be included as part of the replacement allowance).
I find that, for each of the years under appeal the fair market net rent for the first floor space at the subject property, after allowance for landlord costs for tenant improvements, is $27 per square foot. This is consistent with the actual rentals at the property and reflects the locational difference between the subject property and the Palmer Square East and West retail areas.
With respect to the second floor retail area, neither expert provided comparable lease information and both relied upon the actual leases for the space. The average net rental for the two leases in place, dated February 1990 and December 1992, respectively, was $19.88 per square foot. Accordingly, I find a fair market net rent for the second floor retail area is $19 per square foot for each of the three years under appeal. This amount reflects any fit-up costs paid by the landlord.
The next step in the income analysis is the determination of an appropriate vacancy and collection loss percentage. Plaintiffs’ appraiser used 15%, and defendant’s appraiser used 5%. Plaintiffs’ appraiser based his vacancy factor upon the vacancy rates for the subject property for the years 1991 through 1994 which averaged 19.4% (with 1993 at 11.7% and 1994 at 13%). Defendant’s appraiser noted that the retail vacancy rate in downtown *107 Princeton ranged from 3% to 6%, with the vacancy rate in the Palmer Square area being 3% inclusive of the subject property.
The subject property, as reflected in the analysis of comparable rentals discussed above, is a less desirable area than portions of the Palmer Square retail complex closer to Nassau Street. The space in 5 Hulfish Street and the space in the western portion of 47 Huffish Street, which in the aggregate constitute approximately 25% of the total first floor retail area, have the worst locations in the property. A stabilized vacancy and collection loss rate of 10% to 15% would be appropriate for this 25% portion, while a 5% rate would be appropriate for the balance of the first floor retail space. The second floor retail space is also likely to experience a stabilized vacancy and collection loss factor in the 10% to 15% range. Based on this analysis, I find that the appropriate overall vacancy and collection loss factor for the retail portion of the property is 10%.
Under the net rent analysis used by both appraisers, the expenses attributable to the landlord for income approach valuation purposes are limited. The following analysis of the appropriate expense deductions uses the categories selected by the experts.
1. Leasing Commissions — Both experts utilized a commission factor of 5% of effective gross income. I adopt this percentage.
2. Structural Reserves — Plaintiffs’ expert deducted a reserve of 2% of effective gross income while defendant’s expert, based upon the relative newness of the subject buildings, used a reserve of ten cents per square foot. For the reasons set forth supra in my analysis of office segment expenses, I will adopt a reserve of two percent of effective gross income. See The Appraisal of Real Estate, supra, at 449-50 (discussing the use of the replacement allowance).
3. Expenses Relating to Vacant Space — Each appraiser treated as an expense an amount representing the operating costs incurred by the landlord which were not reimbursed because of the vacancy assumption made by the appraiser. Plaintiffs’ appraiser used an expense factor of $4.00 per square foot for calculating these unreimbursed expenses. Defendant’s expert used $7.36 per square foot for 1992 and 1993 and $7.73 per square foot for 1994 as an amount covering “all building related expenses such as utilities, management, repairs and maintenance, real estate taxes and so forth.” Based upon a review of the financial statements for the retail segment of subject property, I find that plaintiffs’ expert’s estimate of reimbursable expenses on a per square foot *108 basis, exclusive of real estate taxes, is the more aceurate.[5] Accordingly, for this expense I will use $4.00 per square foot multiplied by 3,478 square feet (10% vacancy and collection loss factor x 34,775 square feet) or $13,912.
4. Landlord’s Promotional Fund Contribution — Plaintiffs’ appraiser subtracted $8,868 as the landlord’s 25% share of any contributions to the promotional fund for the retail space based upon a $1.20 per square foot annual contribution by retail tenants. Defendant’s expert, although agreeing that $1.20 per square foot was the correct annual contribution of the landlord to the promotional fund, concluded that the tenant contributions to this fund (which was administered by the landlord) constituted an offset against leasing commissions. I find that leasing commissions and promotional fund reimbursements are unrelated items. I further find that plaintiffs’ expert’s deduction of an expense of 25% of the promotional fund as the landlord’s share of such fund is proper. This deduction is $9,389, using a 10% vacancy and collection loss factor.
The foregoing analysis can be summarized as follows:
Gross Potential Income
30,226 square feet at $27 per square foot $816,102
4,549 square feet at $19 per square foot $ 86,431
Total $902,533
Less Vacancy and Collection Loss Allowance (10%) $ 90,253
Effective Gross Income $812,280
*109 Less Expenses:
Leasing commissions (5% of Effective Gross Income) $ 40,614
Structural Reserves (2% of Effective Gross Income) $ 16,246
Expenses Relating to Vacant Space $ 13,912
Landlord’s Promotional Fund Contribution $ 9,389
Total $ 80,161
Net Operating Income $732,119
In their respective Band of Investment capitalization rate analyses for 1992, both appraisers utilized a mortgage interest rate of 9.5% and a mortgage amortization period of twenty-five years. Plaintiffs’ expert used a loan-to-value ratio of 75% and defendant’s expert used 70%. Taking into account the condition of the subject property as of October 1,1991,1 accept the mortgage interest rate and amortization period used by the appraisers (producing a mortgage constant of 10.48%) and find the appropriate loan-to-value ratio for 1992 to be 70%. Plaintiffs’ appraiser utilized a 7.5% equity dividend rate for tax year 1992 and defendant’s appraiser utilized 4.89%. I find that both equity dividend rates are understated. Defendant’s appraiser’s rate is significantly understated, and plaintiffs appraiser’s rate is inconsistent with the 10% equity dividend rate he used for 1993 and 1994. For the third and fourth quarter of 1991, the implied equity dividend rates in the applicable ACLI data ranged from 5.9% to 11.67%, and the equity capitalization rates published by RERC for regional and neighborhood/community shopping centers and by Korpacz for regional malls and strip shopping centers ranged from 7% to 12.5% with average rates ranging from 9.4% to 9.6%. Considering the condition of the subject property and the retail vacancy as of October 1, 1991, as well as the complex multi-use character of the property, I find that the appropriate equity dividend rate as of such date is 9.5%. This rate is slightly lower than that utilized for the office space because the retail segment of the property represented a risk to an investor slightly lower than that represented *110 by the office portion. The capitalization rate for tax year 1992, based upon the foregoing analysis, is 10.19%.
For the tax year 1993, both experts used a mortgage interest rate of 8.5% with a twenty-five-year amortization period. Plaintiffs’ expert utilized a loan-to-value ratio of 75% and defendant’s expert utilized 70%. Plaintiffs’ expert utilized an equity dividend rate of 10%, whereas defendant’s expert utilized 4.51%. For the third and fourth quarters of 1992 the applicable ACLI data reflected implied equity dividend rates ranging from 5.7% to 10.11%, and the retail equity capitalization rates published by RERC and Korpacz ranged from 6.5% to 12.5% with average rates ranging from 9.5% to 9.98%. As in the case of the office segment of the subject property, the retail segment stabilized significantly during 1992. There was, therefore, a concomitant reduction in the risk inherent in owning the property and in holding a mortgage secured by the property. Accordingly, the appropriate mortgage interest rate for 1993 is 8.5% and the appropriate amortization period is twenty-five years (producing a mortgage constant of 9.66%), the appropriate loan-to-value ratio is 75% and the appropriate equity dividend rate is 8.5%. The capitalization rate for 1993 is, therefore, 9.37%.
The appraisers’ 1993 capitalization rate analyses were also applicable to 1994 except that, for 1994, defendant’s expert utilized a mortgage interest rate of 8.25% and an equity dividend rate of 4.42%. For the third and fourth quarters of 1993 the ACLI data reflected implied equity dividend rates ranging from 7.18% to 14.9% and the RERC and Korpacz retail equity capitalization rates ranged from 6% to 12% with average rates ranging from 9.6% to 9.93%. I conclude that the mortgage interest rate, loan-to-value ratio, amortization period and equity dividend rate for 1994 should be the same as for 1993. See New Brunswick v. Division of Tax Appeals, supra, 39 N.J. at 550, 189 A.2d 702 (rejecting the necessity for adjusting assessments based upon fluctuations in the mortgage market). Accordingly, the capitalization rate for 1994 is 9.37%.
*111 Applying the foregoing capitalization rates to the net income determined above produces the following values for the retail segment of the subject property:
1992 $7,184,700;
1993 $7,813,400;
1994 $7,813,400.

VI

Parking Garage Valuation

Of the 421 spaces contained in the parking garage, 210 were leased on a monthly basis to office tenants of the property and 17 were leased on a monthly basis to occupants of the seventeen apartment units. The rental for all such spaces was $85 per month per space for 1992 and 1993 and $80 per space for 1994. Eighty-two spaces were leased to the Nassau Inn (located directly across Hulfish Street from the subject property) for a rental of $40 per month per space. The remaining 112 spaces were available for transient use. In addition, the 210 spaces leased to office tenants were available for transient use on weekends.
In determining the gross potential income for the parking garage, the two appraisers allocated the spaces somewhat differently. Plaintiffs’ appraiser allocated 192 spaces to office tenants because this number was required by the zoning ordinance. Defendant’s appraiser allocated 210 spaces to office tenants based on use. Both appraisers allocated 17 spaces to the apartment units. Because the garage operations did not stabilize until late 1993, I will utilize the 1994 monthly charge of $80 per space as the stabilized economic rent for the 210 parking spaces used by the office segment and for the 17 spaces leased to apartment occupants. Defendant’s appraiser “estimated” that 35 spaces would be leased by retail tenants. No such leasing took place, and, therefore, I reject this estimate.
Plaintiffs’ appraiser included $40 per month for each of the 82 spaces leased to the Nassau Inn. Defendant’s appraiser disregarded such leasing primarily because of the low monthly rent. I find that these spaces were not in demand for leasing by office or *112 retail tenants or for use by transient parkers. Accordingly, the leasing of the spaces to the Nassau Inn produced the highest income achievable for these spaces.
In determining the income attributable to spaces available for transient parkers, plaintiffs’ expert assumed an average parking fee of $4.00 per space per day for 130 spaces and an occupancy percentage of 30% (based upon a 12 hour day, seven days per week) resulting in per diem income of $7.20 per space. Defendant’s expert determined an average daily parking fee of $6.00 per day for 112 spaces for 1992 and 1993 and $6.80 per day for 1994. To account for revenue from the 210 spaces leased to office tenants but available for use on weekends, defendant’s expert added an amount equal to 20% of the rental generated by such leasing.
The operating statements for the parking garage for 1993 and 1994 disclose that the average per diem fee for transient parkers was $6.22 for 1993 and $7.96 for 1994. This amount is calculated by subtracting from the total garage revenue the monthly rentals generated by leased spaces and by treating 210 spaces as available to transient parkers on weekends. Because transient parker revenues for 1994 may have been unusually high, I accept defendant’s expert’s determination of $6.80 per day per space as the appropriate income for the transient parking spaces.
In determining expenses, both appraisers analyzed and relied upon actual expenses shown in the operating statements. Most expenses were generally consistent from year to year. Plaintiffs’ appraiser calculated items of expense as percentages of gross income. Because his income amount changed for each year under appeal, his expense amounts also changed. Defendant’s appraiser based his expenses on the dollar amounts shown in the operating statements, using the same expenses for 1992 and 1993 and different expenses for 1994. The percentage of gross income represented by items of expense varied substantially from year to year.' I find, therefore, that defendant’s appraiser’s analysis of expenses for repairs, utilities, insurance, administrative, and reserves is more convincing and accept that analysis, but I will *113 stabilize and round these expenses for all three years under appeal as follows:
Repairs $22,500
Utilities $40,000
Insurance $ 8,000
Administrative $20,000
Reserves 2% of gross income
Two items of expense, Grounds/Security and Garage Expense (the fee paid to the garage operator, Kinney Systems) require further discussion. The Grounds/Security expense increased from approximately $8,000 per year in 1992 and 1993 to $25,038 for 1994. Defendant’s appraiser concluded that this increase resulted from the property owner’s taking “a more active role” in the garage operation. I accept $25,000 as the appropriate amount for this expense in accordance with defendant’s appraiser’s analysis. The Garage Expense, including operational and marketing expenses, was $286,161 for 1992, $138,378 for 1993 and $170,118 for 1994. Defendant’s appraiser utilized $280,179 for 1992 and 1993 in this category and $150,000 for 1994 based upon his determination that property management assumed certain functions previously performed by others, resulting in a decrease in salaries and benefits. The 1994 actual expenses may have been reduced because the subject garage and the nearby Chambers Street Garage were operated together. The reductions in Garage Expense between 1992 and 1993 and the approximately $30,000 increase between 1993 and 1994 indicate that this expense for the subject garage, if operated independently from the Chambers Street Garage, would stabilize at a somewhat higher level than the actual 1994 expense. Accordingly, I will utilize $200,000 as the Garage Expense.
The foregoing analysis of income and expenses can be summarized as follows:
Income:
210 spaces x $80 x 12 months = $201,600
17 spaces x 880 x 12 months = $ 16,320
82 spaces x $40 x 12 months = $ 39,360
*114 112 spaces x $6.80 x 365 days = $277,984
210 spaces x $6.80 x 104 days[6] = $148,512
Total $683,776
Expenses:
Repairs $ 22,500
Utüities $ 40,000
Grounds/Seeurity $ 25,000
Administrative Expense $ 20,000
Insurance $ 8,000
Reserves (2% of Effective Gross Income) $ 14,000
Garage Expense $200,000
Total $329,500
Net Operating Income $354,276
Both appraisers had difficulty supporting their respective capitalization rates. Defendant’s appraiser used the highest rate from his office component valuation on the theory that, as of the relevant assessing dates, an investment in the parking garage was as risky as an investment in office space. Plaintiffs’ appraiser supported his capitalization rate based upon the information published by the ACLI in the “Other Commercial” category. The ACLI data in this category was scant, and the expert provided no assurance that the category included parking garages. Giving due allowance to the limited information available to the appraisers, I find that the capitalization rates for the parking garage should be consistent with those in my office component valuation. I will, therefore, use overall capitalization rates (including tax factors) of 12.19% for 1992,11.43% for 1993 and 11.51% for 1994.
Applying these capitalization rates to the net income of $354,276 for each year under appeal produces the following values for the parking garage:
*115 1992— $2,906,300;
1993— $3,099,500;
1994— $3,078,000.

VII

Seventeen Apartments Valuation

For all years under appeal the seventeen existing residential units were operated on a rental basis. The parties stipulated that the fair market value for these units was $3,317,700 for tax year 1992 and $2,100,000 for tax year 1993. Only tax year 1994 remains in issue. For that year the parties stipulated the gross potential income and expenses, leaving the vacancy and collection loss factor and the capitalization rate as the only items requiring resolution.
Defendant’s appraiser used a 5% vacancy and collection loss factor based upon the low vacancy rate for the limited number of residential apartment units in Princeton Borough and the subject property’s 1994 vacancy and collection loss rate of approximately 5%. Plaintiffs’ expert, while conceding that the subject apartments generally were fully occupied since the end of 1993, used a stabilized vacancy and collection loss factor of 7.5% because the majority of tenants were students and others who remained in occupancy for relatively short terms. There is no factual support in the record for this analysis. I will use a vacancy and collection loss factor of 5%.
In determining the appropriate capitalization rate, I accept defendant’s expert’s selection of a mortgage interest rate of 8.25%, and, consistent with my analysis of the office, retail and garage components of the property, I will utilize a mortgage amortization period of twenty-five years (producing a mortgage constant of 9.46%) and a loan-to-value ratio of 75%.
Plaintiffs’ expert selected an equity dividend rate of 9.5% and defendant’s expert selected 6.62%. For the third and fourth quarters of 1993, the applicable ACLI data reflects implied equity dividend rates ranging from 7.18% to 15.14% and the equity *116 capitalization rates for apartments published by RERC and Korpaez ranged from 7.5% to 10% with average rates ranging from 8.7% to 9.07%. I find the appropriate rate to be 8% which reflects a somewhat lower risk than the office and retail segments of the subject property. The basic capitalization rate for the tax year 1994 is, therefore, 9.1% to which the effective tax rate of 2.01% must be added for a total capitalization rate of 11.11%. The value of the apartment units for the tax year 1994 is thus:
Gross Potential Income (stipulated) $328,320
Less Vacancy and Collection Loss Factor (5%) 16,416
Effective Gross Income $311,904
Less Expenses (stipulated) $ 73,798
Net Income $238,106
$238,106 capitalized at 11.11% equals $2,143,200.

VIII

Ninety-Seven Rights to Build Valuation

On March 19, 1987, the Regional Planning Board of Princeton granted preliminary and final site plan approval for the construction of ninety-seven additional residential units at the subject property to be located along the perimeter of, and above, the parking garage. In or about February 1990, the Board adopted a Resolution modifying such approval, granting “amended preliminary and final site plan approval with variance” subject to conditions, and permitting construction of units which “will range in size from 1,500 to 2,500 square feet with average units in the 2,000 feet range.”
The conditions in the Resolution were numerous, requiring (in general categories): (i) revisions to the plans and drawings for the buildings and to the landscape plan; (ii) entry into a developer’s agreement with the Borough; (iii) additional engineering details; (iv) review and approval of the condominium documents for the *117 property; (v) review and approval of the phasing plan for the property; (vi) escrow of inspection fees; (vii) posting of performance guarantees; (viii) approval of a recycling plan; and (ix) payment of additional amounts for professional review costs. In order to satisfy these conditions, the developer of the property was subject to review and approval by, as applicable, an Ad Hoc Committee of the Regional Planning Board, the Board’s Landscape Committee, the Borough Engineer, the Borough Shade Tree Commission and the Mercer County Improvement Authority. Many of these conditions were not unusual for site plan approval, and the quantity and extent of the conditions increased because the subject property, as a multi-use, multi-building development, was unique in the Borough of Princeton. The Zoning Officer for the Borough estimated, without contradiction, that the approvals required by the conditions could be obtained within approximately three months assuming that the developer acted expeditiously and diligently.
The parties stipulated that the parking garage deck was designed to support future residential construction and was designed and constructed with sufficient bearing capacity to carry the weight of the proposed ninety-seven residential units (in addition to the existing seventeen units) as well as soil between the units to a depth of three feet. The parties further stipulated that sanitary sewer risers were constructed within the garage to provide for future connection -with the residential units, sewer line connections were installed on top of the garage for future connection with the buildings containing the ninety-seven units and piping was installed within the garage for future fire hydrants to be constructed on the garage deck.
Both appraisers valued these ninety-seven rights to build on the basis of comparable land sales. Plaintiffs’ appraiser relied upon three sales of vacant land approved for development with apartments or townhouses, but unimproved in terms of site work such as installation of roads, curbs and utility lines. After analyzing and adjusting these sales, the appraiser determined a value of $20,000 per unit or $1,940,000 for the subject ninety-seven rights *118 to build. The appraiser concluded there was a 5% decline in values between October 1, 1991 and October 1, 1992 with values remaining stable through October 1,1993. Accordingly, his value for the ninety-seven rights to build for each of the tax years 1993 and 1994 was $1,845,000.
Defendant’s appraiser relied upon comparable land sales approved for development with single family houses or townhouses and apartments but unimproved in terms of site work. The expert’s analysis of each sale involved determining the projected sales price of the units to be constructed, and then calculating the percentage of this sales price represented by the purchase price for the land. This calculation was intended to reflect the thinking of a purehaser/developer of each of the properties, who would calculate land cost as a percentage of the anticipated sales price of the residential units constructed pursuant to the approvals. After adjusting the comparables to the physical characteristics of the subject property (other than the availability of the parking garage deck as a foundation), the expert concluded that this percentage for the subject property was 20%.
Defendant’s expert then determined a projected sales price for the approved ninety-seven units based upon sales of condominiums located above the retail development on Palmer Square West (across the street from the subject property). He concluded that the adjusted sales price for the subject units would be $160 per square foot or an average sales price of $275,000 (at an average unit size of 1,719 square feet). Multiplying this amount by 20% produced a value for each of the ninety-seven rights to build of $55,000 or a total value of $5,335,000 for each of the three years under appeal.
The analyses of both appraisers have deficiencies. Plaintiffs’ appraiser used comparable sales of approved, but unimproved, land and made a direct comparison. The subject property must, with respect to the ninety-seven rights to build, be considered partially improved. The road network existed, certain utility lines were available where the units would be located, and the parking deck provided a foundation for the units. The appraiser made no *119 adjustment for the cost savings the developer would realize from this partially improved status. Plaintiffs’ appraiser’s value of $20,000 per unit, based wholly upon unimproved land sales, is, therefore, inadequate.
Defendant’s appraiser’s analysis assumed that the ninety-seven units, when built, would be marketed as condominiums. There is no support in the record for this assumption. The 114 approved residential units were initially intended to be so marketed, and a Public Offering Statement was prepared in June 1990. Formal creation of the condominium never occurred, however, and the seventeen units constructed have been operated only as rental apartments. No effort has been made to convert these units to condominiums. The condominium units sold at Palmer Square West, which provided the basis for the expert’s finding of market demand, were generally approximately one-third of the average size of the approved ninety-seven units. The sale of these Palmer Square West units does not, therefore, necessarily support a finding of market demand for the ninety-seven units. Accordingly, defendant’s expert’s assumption that the subject units, when built, will sell as condominiums at an average price of $275,000 is untenable.
Given the history of the subject property, and the operation of the existing seventeen residential units, it is reasonable to assume that the ninety-seven units could be built as rental apartments. This possibility is contemplated in the Brochure and PSN Memorandum. No modification of the site plan approval would be required to build and operate the units as rental apartments. The value for the seventeen apartment units for 1994, the only year litigated, is set forth above at $2,143,200. This equals $126,070 per unit and $92.50 per square foot at an average size of 1,363 square feet. The average size of the ninety-seven units will be 1,719 square feet. At $92.50 per square foot, this translates into a per unit value of $159,000 (rounded).[7] I accept the analysis of *120 defendant’s appraiser that the “land value” for each unit should equal 20% of total value or $31,800 per unit.[8] This produces a fair market value for the ninety-seven rights to build of $3,084,600.

IX

Chapter 123; One Assessment or Multiple Assessments

With the value of each component of the subject property having been determined, the only remaining issue relates to the application of the Chapter 123 Ratio pursuant to N.J.S.A. 54:51A-6. Because the Princeton Borough Assessor established multiple line items for the subject property, plaintiff contended that the Ratio should be applied separately to each line item. Because the property constituted only one lot on the Borough Tax Map, the defendant contended that the proper Ratio analysis requires comparison of the total of the assessment line items with the total value of the components of the property.
During the course of the trial, I ruled by oral opinion that, for Chapter 123 purposes, the property should be treated as having one aggregate assessment. I adhere to that ruling. The following is, in part, a condensation and, in part, an amplification of my oral opinion. I include it because there is no reported decision on this specific issue, even though assessors not infrequently divide a single parcel into multiple assessment line items as an accommodation to taxpayers. Here, the use of multiple line items resulted *121 primarily from the Assessor’s accommodation of a request by the owner of the subject property in 1990 and 1991 so that the owner could more easily allocate property taxes among tenants.
By 1990 the property was shown on the Borough Tax Map as one lot, initially Lot 105 in Block 20.04 and, commencing in 1991, as Lot 1 in Block 20.04. The Map included dashed lines outlining the individual components of the property. These dashed lines were consistent with the proposed condominium at the property and were inserted even though the property was not subdivided and the condominium never implemented. The Assessment List was also generally in conformity with the contemplated condominium and, as described above, the assessments related to the use components of the property and not to each building.
The Assessment List, as required by N.J.A.C. 18:12-2.1, established a property class for each segment of the property, with the apartments being designated as Class 2 (residential), the commercial line items as Class 4A (commercial) and the rights to build as Class 1 (vacant land). See N.J.A.C. 18:12-2.2 (defining the property Classes). These designations were also used by the Assessor in preparing the SR-3A Form submitted to the Mercer County Board of Taxation (and submitted by the Board to the Division of Taxation) pursuant to N.J.S.A. 54:4-26 and N.J.A.C. 18:12A-1.17(a)(3), and were used by the Director of the Division of Taxation in calculating the applicable Chapter 123 Ratios for the Borough for the tax years under appeal.
The significance of the separate line items must first be considered with reference to the applicable statutes and regulations. N.J.S.A. 54:4-23 requires that “[t]he assessor shall ... determine the full and fair value of each parcel of real property situate in the taxing district . . . .” Under N.J.S.A. 54:4-24; “The assessor shall ... set down in proper columns opposite each name the description and area of each parcel sufficient to ascertain its location and extent and the taxable value of each parcel as determined by him.” N.J.S.A. 54:4-28 provides: “In taxing districts having adopted block assessment maps the assessor, in making assessments for *122 taxes, shall describe the real property by block and lot numbers as shown upon the assessment map.”
N.J.S.A. 54:51A-6, which sets forth the application of the Chapter 123 Ratio in the Tax Court, does not refer to a “parcel” or “lot” but simply refers to “the subject property.” This reference should be interpreted in a manner consistent with the statutory pattern so that “the subject property” is equivalent to a “parcel” within the meaning of N.J.S.A. 54:4-23 and 24. See In re Sheffield Farms Co., 22 N.J. 548, 554, 126 A.2d 886 (1956) (stating that the “true meaning” of statutory language must be derived from reading the words of the section involved “in connection with the entire enactment of which it is an integral part”). See also New Jersey Transit Corp. v. Somerville Bor., 139 N.J. 582, 588-89, 661 A.2d 778 (1995) (noting the necessity to construe broadly the phrase “taxpayer feeling aggrieved” in N.J.S.A 54:3-21).
The regulations applicable to the preparation of the Tax Assessment List appear in N.J.A.C. 18:12-2.8. Paragraph (b)(1)(ii) of this Section is entitled “Columnar headings,” and provides: “The following headings shall appear on the real property tax list and duplicate----(2) Column 2 — Block number, lot number, qualification code and account number: Insert the block and lot number of the parcel and the qualification code if any.” N.J.A.C. 18:12-2.5 provides specifically for a separate line item for the portion of property in one tax lot which qualifies for farmland assessment and a separate line item for the portion not qualified. No other regulation contemplates or permits the establishment of separate line items for portions of the same lot.
Under N.J.S.A. Acts Saved From Repeal, § 54:1-15(1):
Each city, borough, village and town shall provide for the use of the assessor or other taxing officials an accurate map of its territory, prepared for purposes of taxation, showing, among other things, the location and width of ... each individual lot of land or premises, and cause each parcel or lot of land to be numbered or otherwise designated thereon, and it shall be a sufficient description of property for the purposes of taxation to refer to the said map by lot and block number.
N.J.A.C. 18:23A-1.1(a)(11) provides that: “A tax map may be defined as a map or maps drawn to scale, indicating every lot of land and condominium unit identified by a block and lot number, *123 except those areas allocated to roads, streets, highways, and tidal waters outside of riparian grants.” Under N.J.A.C. 18:23A-1.10(a): “Lot numbers shall be assigned to every lot in the municipality including lots along the boundary lines . . . .” N.J.A.C. 18:23A-1.28 and 1.31 provide for the use of dashed lines (such as appear on the Tax Maps for the years under appeal showing the subject property) only in connection with condominiums, N.J.A.C. 18:23A-1.28(a)(1)(iii), and in connection with air rights. N.J.A.C. 18:23A-1.31(a)(1).
The terms “parcel,” “lot” and “subject property” as used in the foregoing statutes and regulations have not been defined by our courts in the Chapter 123 context. The proper meaning for Chapter 123 purposes can, however, be derived from analogous decisions read in light of the statutory language and regulations. In City of Newark v. West Milford Tp., 9 N.J. 295, 88 A.2d 211 (1952), the term “parcel” appearing in N.J.S.A. 54:4-23 was defined as: “a unit of land, together with concomitant improvements, if any.” Id. at 304. In Koester v. Hunterdon County Bd. of Taxation, 79 N.J. 381, 399 A.2d 656 (1979), which involved the issue of the extent of municipal tax lien rights where the land component of a tax lot was assessed to one taxpayer and the improvements (mobile homes) were separately assessed to the various occupants, the Supreme Court accepted such definition and held, relying upon Becker v. Mayor of Little Ferry, 126 N.J.L. 338, 19 A.2d 657 (E & A1941), that “the aggregate tax is a lien on the entire fee even where there is separate ownership of the land and the improvement.” Koester, supra, 79 N.J. at 392, 399 A.2d 656.
Becker also involved two assessments on one tax lot, the land being assessed to the owner and the improvements to the lessee which had constructed them. The then Supreme Court held that the municipal tax lien arising from a default in payment of improvement taxes extended to the land and noted that “the government’s right to collect tax levies may not be thwarted or complicated by a theoretical division of that which has long been regarded by our jurisprudence as realty into subdivisions with ill- *124 defined limits and vague attributes . . . . The mistaken course of the assessor does not deprive the municipality of the right to enforce its tax lien against real estate.” Becker v. Little Ferry Bor., 125 N.J.L. 141, 144, 14 A.2d 493 (Sup.Ct.1940), aff'd, 126 N.J.L. 338, 19 A.2d 657 (E & A 1941). In affirming, the Court of Errors and Appeals held:
Cases holding that the lessee may be taxed by reason of his interest in real estate do not relieve the landowner of his obligation. The fee cannot be carved to the disadvantage of the municipality. If the owner of land is desirous of avoiding taxes, which the tenant should pay, he may arrange so by contract. But the municipality in assessing land is not obliged to cast around to see who has a leasehold interest therein.
[Becker, supra, 126 N.J.L. at 340,19 A.2d 657.]
Under Koester and Becker, even though the Princeton Borough Assessor established multiple line items for the subject property and the Borough Tax Collector issued a separate tax bill for each line item, the Borough could enforce its tax lien against all of Lot 1 in Block 20.04 in the event of a default in the payment of taxes as to any one of the line items on the Assessment List.
The next relevant decision is Lake End Corp. v. Rockaway Tp., 185 N.J.Super. 248, 448 A.2d 475 (App.Div.1982), which involved large tracts of land of which small plots were leased to shareholders of the plaintiff corporation under ninety-nine year ground leases. The assessor separately assessed each plot. The Appellate Division held that, for tax appeal purposes, these separate assessments should be the basis for valuation because the individual leasehold plots constituted “separate marketable segments.” Id. at 256, 448 A.2d 475. The court did not, however, hold that these “marketable segments” must be assessed separately.
The leaseholds could properly be assessed to the tenants rather than the owners. While such an assessment by the township might be more convenient, it is not required. The courts have acted to insure that full real property taxes are paid regardless of ownership and to facilitate the collection of such taxes regardless of ownership.
[Id at 257, 448 A.2d 475.]
The final relevant decision is Young v. Bergen County Bd. of Taxation, 5 N.J.Tax 102 (1982), where Judge Evers reviewed the provisions of N.J.S.A. 54:4-23, 24 and 28 and held, in a tax appeal context: “Thus, the block and lot designations, where applicable, *125 establish the identity of the parcel of real property for separate assessment purposes.” Id. at 106.
The foregoing cases, when considered together with the applicable statutes and regulations, require the conclusion that the subject parcel should be treated as one assessment and the Borough Assessor’s voluntary segregation of one tax lot into multiple assessment line items should be disregarded in applying Chapter 123. There are no long term ground leases dividing the subject property into marketable segments. There has been no subdivision of, and no condominium at, the property. Indeed, the assessments do not even relate to separate buildings, but rather are imposed by function or use.
While a municipality “is not obliged” to send separate tax bills to the respective owners of the building and the land, we find nothing in Becker, or in reason, for precluding it from doing so without waiving the municipality’s lien on the land and its improvements for the total assessed value of the parcel.
The Borough of High Bridge has urged the Court to permit it to continue to assess the mobile home owners individually, pointing out that “to do otherwise will unfairly deprive these older people of valuable federal and state income tax deductions.” Since it is willing to undertake the incidental administrative burdens, we see no reason why the Borough’s discretionary authority to do so should not be recognized, bearing in mind that the tax revenues will remain fully protected by virtue of the holding in Becker v. Little Ferry, supra, 126 N.J.Law 338, 19 A.2d 657, which we support.
[Koester, supra, 79 N.J. at 393, 399 A.2d 656.]
Just as the Assessor’s voluntary creation of separate assessments does not control for tax lien purposes, so here the Assessor’s voluntary undertaking of the administrative burdens of multiple line items, where establishment of those line items was not authorized by statute or regulation, does not control for Chapter 123 purposes.
The plaintiffs also contended that, notwithstanding all of the foregoing, the Borough should be estopped from disputing the significance of the separate assessment line items. Plaintiffs cited, as the detrimental reliance required to invoke the doctrine of estoppel, the withdrawal at the Mercer County Board of Taxation of appeals of the 1992 assessments involving only the seventeen apartment units included within the subject property. The only documentary evidence as to such appeals, however, *126 consisted of Petitions of Appeal filed on behalf of the Borough. Withdrawal of these appeals by the Borough obviously could not constitute detrimental reliance by either plaintiff.
The doctrine of estoppel is rarely applicable in a taxation context.
Doctrines of estoppel are not applied against the state and its counties and municipal corporations to the same extent as they are against individuals and private corporations.
In any event, the application of principles of estoppel is particularly inappropriate where the collection of taxes by a public body is involved, except in unusual circumstances.
[Gehin-Scott v. Willingboro Tp., 1N.J.Tax 546, 550, 424 A.2d 481 (1980) (citation omitted).]
In St. Michael’s Passionist Monastery v. City of Union City, 5 N.J.Tax 415 (1983), the court noted that: “The doctrine of estoppel is not lightly invoked against government, especially in tax matters, where the public interest is so vitally affected. To invoke estoppel against a governmental agency the circumstances must be extreme . . . . A taxing authority is not bound or estopped by the unauthorized acts of its officers.” Id. at 418-19. In Airwork Serv. Div. v. Director, Div. of Taxation, 2 N.J.Tax 329 (1981), aff'd, 4 N.J.Tax 532 (App.Div.1982), aff'd, 97 N.J. 290, 478 A.2d 729 (1984), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), the Director reversed a published position regarding collection of sales tax from out-of-state customers who contracted for in-state repair services. The taxpayer claimed that, because it could no longer collect the sales tax from customers on previously completed transactions, the State should be estopped from collecting the sales tax. The Tax Court disagreed:
The collection and enforcement of taxes is a strict governmental function and vitally affects the public interest. The taxing authority is not bound or estopped by unauthorized acts of its officers, nor may estoppel be invoked in cases of agency acquiescence or reversals or modifications of prior positions. Moreover, a rule or regulation of a state tax commission purporting to exempt a taxpayer or a transaction from tax liability where authority to do so has not been specifically granted by the Legislature cannot operate as an estoppel to collect the tax, even in the case of transactions which have been closed so that the seller cannot collect the tax from the purchaser.
[/<£ at 343.]
*127 Under the foregoing decisions, the circumstances here do not justify the application of the doctrine of estoppel.
Lastly, plaintiffs argued that, because the class designations made by the Assessor with respect to the subject property’s various line items were utilized by the Director of the Division of Taxation in computing the Borough’s Chapter 123 Ratios for the years under appeal, such line items must be utilized in the application of the Ratios so computed. The certification of George Lorbeck, which was submitted on behalf of the Director as amicus curiae, confirmed that the Chapter 123 Ratios for the Borough for the years under appeal were in fact based upon the property class designations appearing in the Assessment Lists. Mr. Lorbeck included in his Certification a recomputation of the Chapter 123 Ratios if the subject property were assigned solely to Class 4 (which includes commercial, industrial and apartment properties, N.J.A.C. 18:12-2.2(e), (f) and (g)). The recomputation resulted in Ratio changes of 0.03% for each of 1992 and 1994 and 0.01% for 1993.
In Murnick v. City of Asbury Park, 95 N.J. 452, 471 A.2d 1196 (1984), the Supreme Court, in response to a taxpayer’s contention that the ratio study at issue included certain sales which should have been excluded, held: “If the Director has included incorrect information that substantially skews the ratio, a taxpayer has a right to bring timely application to correct the deviation.” Id. at 464, 471 A.2d 1196. The modifications to the Chapter 123 Ratios required if the subject property is treated as all Class 4 are extremely minor. The Ratios as originally calculated, therefore, were not “substantially skewed” by the property class designations included in the multiple line items established by the Borough Assessor.
There have been here a series of errors or unauthorized acts, all performed in good faith, namely:
1. the Assessor, as an accommodation to the then-owner of the subject property, agreed to segregate the property into separate assessment line items and assigned different property class designations to different segments of the property;
*128 2. the Tax Map was prepared using dashed lines for building components when such usage was authorized only for condominiums and air rights;
3. an appeal in 1990 or 1991 of the assessment on the subject parking garage was settled by reducing only such assessment; and
4. in 1992 there was a withdrawal of appeals relating only to seventeen apartment assessments.
These errors or unauthorized actions do not, either individually or collectively, justify ignoring, for Chapter 123 purposes, the mandates of the statutes and regulations or ignoring the reality of what the subject property was, and is, and how its owners have treated it. For the years under appeal, therefore, the subject property will be treated as one parcel, one lot and one assessment. The Chapter 123 Ratios as originally calculated by the Director will be applied, that is, 49.61% for 1992, 48.84% for 1993, and 48.18% for 1994.
As the foregoing discussion demonstrates, the Borough Assessor’s division of a single tax lot into multiple line items created the following problems:
a. the Borough’s Chapter 123 Ratio was calculated based on incorrect data;
b. multiple tax appeal petitions and complaints were filed where ordinarily only one petition or complaint per tax lot is required; and
c. confusion arose as to whether each assessment line item should be valued separately.
These same problems are likely to arise whenever an assessor assigns multiple assessment line items to a single tax lot. Accordingly, although Koester, supra, permits such practice (but gives it no legal effect), the practice is nevertheless contrary to the provisions of applicable statutes and regulations and is strongly discouraged. Assessments should be imposed in accordance with such statutes and regulations so that, except where a farmland assessment is involved, there is only one assessment for each tax lot.
*129 z

Valuation Summary

The value of the subject property, as the sum of its component values, for each year under appeal is:
1992
Office Area $ 8,874,500
Retail Area 7.184.700
Parking Garage 2,906,300
Apartments 3.317.700 (stipulated)
Rights to Build 3,084,600
Total $25,367,800
1993
Office Area $ 9,464,600
Retail Area 7,813,400
Parking Garage 3,099,500
Apartments 2,100,000 (stipulated)
Rights to Build 3,084,600
Total $25,562,100
1994
Office Area $ 9,398,800
Retail Area 7,813,400
Parking Garage 3,078,000
Apartments 2,143,200
Rights to Build 3,084,600
Total $25,518,000
*130 For tax year 1992 the Chapter 123 Ratio is 49.61% and the Upper Limit is 57.05%. The ratio of the 1992 assessment of $13,137,800 to the above 1992 value of $25,367,800 is 51.79%. This assessment is, therefore, within the Chapter 123 common level range.
For tax year 1993 the Chapter 123 Ratio is 48.84% and the Upper Limit is 56.17%. The ratio of the 1993 assessment of $13,137,800 to the above 1993 value of $25,562,100 is 51.40%. The assessment is, therefore, within the Chapter 123 common level range.
For tax year 1994 the Chapter 123 Ratio is 48.18% and the Upper Limit is 55.41%. The ratio of the 1994 assessment of $13,226,000 to the above 1994 value of $25,518,000 is 51.83%. The assessment is, therefore, within the Chapter 123 common level range.
Judgments will be entered affirming the assessments on the subject property for all three years under appeal.
APPENDIX
APPRAISERS’ VALUATION CONCLUSIONS:
Plaintiffs’ Appraiser
A) 1992 Value by Components
Office and Retail $14,745,000
Parking Garage 2,160,000
17 Apartment Units 3,317,700 (stipulated)
97 Rights to Build 1,940,000
Total $22,162,700
1992 One Economic Unit Value $17,750,000
B) 1993 Value by Components
Office and Retail $14,650,000
Parking Garage 2.375.000
17 Apartment Units 2.100.000 (stipulated)
97 Rights to Build 1.845.000
Total $20,970,000
*131 1993 One Economic Unit Value $18,850,000
C) 1994 Value by Components
Office and Retail $14,585,000
Parking Garage 2,410,000
17 Apartment Units 1,975,000
97 Rights to Build 1,845.000
Total $20,815,000
1994 One Economic Unit Value $18,850,000
Defendant’s Appraiser
A) 1992
Office $10,600,000
Retail 11,200,000
Parking Garage 2,800,000
17 Apartment Units 3,317,700 (stipulated)
97 Rights to Build 5,335,000
Total $33,252,700
B) 1993
Office $10,800,000
Retail 11,550,000
Parking Garage 2,800,000
17 Apartment Units 2.100.000 (stipulated)
97 Rights to Build 5.335.000
Total $32,585,000
C) 1994
Office $10,830,000
Retail 11,900,000
Parking Garage 3.700.000
17 Apartment Units 2.260.000
97 Rights to Build 5,335,000
Total $34,025,000

 See Appendix for the component and aggregate values determined by each appraiser.

 But see Tamburelli Properties Ass’n v. Cresskill Bor., 15 N.J.Tax 629 (1996) in which Judge Kahn accepted a discounted cash flow analysis as applied to a large tract of vacant land, the highest and best use of which was as a single family residential subdivision, where: (i) the record contained no comparable land sales applicable to valuation of such subdivision; (ii) appraisers for both parties used such analysis; (iii) the parties stipulated the sales price of subdivided lots and the direct and indirect development costs; and (iv) the parties were essentially in agreement as to the holding period and discount rate.

 The RERC data is entitled "going-in cap rate” and defined in the RERC publication as “first year net operating income divided by present value.” The Korpacz data is entitled "free and clear equity cap rate” and defined in the Korpacz publication as "initial cash-on-cash rate of return on the equity investment.” These terms, as so defined, are interchangeable with the terms "equity dividend rate” and "equity capitalization rate” as defined in The Appraisal of Real Estate, supra, at 415.

 The use throughout this opinion of basic capitalization rates for 1993 and 1994 which are lower than the basic rates used for 1992 is arguably inconsistent with the objective of stabilization of value discussed supra. Pursuit of such objective should not, however, preclude examination and consideration of the reality that changes in property and market conditions affect investment risk.

 Real estate taxes cannot be deducted as an expense, but, as discussed supra, a tax factor is properly added to the basic capitalization rate when property is valued on the basis of gross rents. New Brunswick v. Division of Tax Appeals, supra, 39 N.J. at 545-547, 189 4.2d 702. If proofs were presented that, in a net rent context, the landlord is responsible for real estate taxes attributable to vacant space or space occupied by tenants in financial default, the addition to the basic capitalization rate of a tax factor, equal to the effective tax rate multiplied by the vacancy and collection loss allowance, would appear to be appropriate. Cf. Humble Oil & Refining v. Englewood Cliffs Bor., 71 N.J. 401, 403-405, 365 A.2d 929 (1976) (Conford, J. concurring) (indicating that, where a landlord pays the properly taxes, a tax factor must be included in the capitalization rate, but, where the tenant pays the taxes, no tax factor need be included); see Roland D. Nelson, Expenses on a Triple-Net Lease, 1991 The Appraisal Journal 551 (stating that, in a net lease income approach analysis, a tax expense, equal to the total property taxes multiplied by the vacancy and collection loss allowance, should be deducted). Contra RTC Properties, supra, 13 N.J.Tax at 157 (holding that, in a net lease income approach analysis, the capitalization rate should not include a factor representing property taxes allocable to vacant space because "that space, by virtue of the vacancy and loss allowance, is not being valued"). No such proofs were presented herein.

 210 spaces are available for two-sevenths of the year. Two-sevenths of 365 days equals 104 days.

 There is no basis in the record for an adjustment in the cost per square foot relating to the larger average size of the ninety-seven units. The Real Property *120 Appraisal Manual for New Jersey Assessors indicates that the unit cost may be approximately 3% lower for the larger units. 2 Real Property Appraisal Manual for New Jersey Assessors II-37 (3d ed.). This cost reduction is uncertain and is insignificant for purposes of this opinion.

 Although defendant's appraiser calculated this 20% land cost on the assumption that the units would be constructed and sold as condominiums, there is no basis in the record to change the percentage when valuing the units based upon construction of rental apartments. In any event, using the same percentage appears warranted by the existence of the parking deck as a foundation for the units and by the status of the subject property as the only site in Princeton Borough available and approved for multi-family construction as of the relevant assessment dates.