**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

June 15, 2022

Michael I. Schneck, Esq.
Schneck Law Group, LLC
301 South Livingston Avenue, Suite 105
Livingston, New Jersey 07039

Dominic P. DiYanni, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Boulevard, Bldg. A
Warren, New Jersey 07059

>       Re:     27 Orange Rd, LLC v. Montclair Township[1]
>               Docket No. 007706-2020

Dear Mr. Schneck and Mr. DiYanni:

This letter shall constitute the court's opinion following trial of the local property tax appeal commenced by plaintiff, 27 Orange Rd, LLC ("plaintiff"). Plaintiff challenges the 2020 local property tax assessment on its improved property located in Montclair Township ("Montclair").[2]

For the reasons stated below, the court reduces the 2020 tax year local property assessment.

## I.    Findings of Fact

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law

---

[1]    The court issued an opinion in this matter on June 15, 2022, bearing transaction id TAX2022109843. However, a typographical error was subsequently discovered on page 14 that did not alter the court's final determination but required entry of this corrected opinion.

[2] Plaintiff also filed Complaints under docket nos. 012068-2018, 009163-2019, and 009113-2021, challenging the 2018, 2019, and 2021 tax year assessments. However, on the eve of trial, plaintiff withdrew its Complaints for the 2018, 2019, and 2021 tax years. Montclair subsequently withdrew its Counterclaim for the 2019 tax year.






based on the evidence and testimony adduced during trial.

Plaintiff is the owner of the real property and improvements located 27 Orange Road, Montclair Township, Essex County, New Jersey (the "subject property"). The subject property is identified on Montclair's municipal tax map as block 1404, lot 21.

The subject property is located near the intersection of Orange Road and Bloomfield Avenue in Montclair's central business district. The subject property is situated immediately adjacent to the MC Hotel and close to the Orange Road public parking deck. As of the valuation date, the site comprised a level 0.0785-acre rectangular-shaped parcel. The lot is approximately 25 feet wide and has a depth of 138 feet, or 3,420 square feet.

Plaintiff filed a Petition of Appeal challenging the subject property's 2020 local property tax assessment with the Essex County Board of Taxation (the "Board"). On or about April 4, 2020, the Board issued a Memorandum of Judgment affirming the local property tax assessment (the "Judgment"). Plaintiff then filed a timely Complaint with the Tax Court challenging the Judgment. Montclair timely filed a Counterclaim.

As of the valuation date, the subject property was improved with a one-story, brick and concrete block garage with a cement floor, built circa 1920. According to plaintiff's expert, the garage measures 25 feet wide x 91 feet long, resulting in a gross building area of 2,275 square feet (25 feet x 91 feet = 2,275 feet).[3] The garage facade contains an overhead nine-foot drive-in door

---

[3] Plaintiff's expert's report and testimony is that the garage is 2,112 square feet. However, plaintiff's Certified Answers to Standard Interrogatories, state that the building is "Two thousand three hundred (2,300) +/- square feet." In response to the court's questioning how he calculated the building's size, plaintiff's expert testified that he "measured the [building], . . . I measured this at 25' x 91'." However, because he did not have access to two exterior sides of the building, he consulted the NJACTB website, which reports the building as 2,112 square feet. Thus, plaintiff's expert accepted the square footage reported on the NJACTB website and disregarded his own measurements. Therefore, the court finds that the building is 2,275 square feet.






that is not operational. To the left of the drive-in door is an entry door providing an additional means of access to the garage. The garage has an approximately 25-foot wide by 47-foot-long macadam driveway providing access to Orange Road. The garage appears to have been constructed in two sections, the front section contains an approximately 12-foot ceiling with a flat roof, while the rear section contains an approximately 10-foot ceiling with a gable roof.

The subject property is occupied by plaintiff's owner, who utilizes it to store assorted fitting and supplies for his plumbing business, as well as three multi-decade old automobiles in poor condition. The court's review of plaintiff's expert's photographs reveals that the overhead garage door is damaged and sagging at its center point. The garage's interior is cluttered with miscellaneous debris, plastic five-gallon containers, a metal shopping cart, and sections of new and used metal pipes strewn across the ground and on top of the automobiles. Portions of the front section of the garage's ceiling have collapsed from what appears to be water leaks that emanated from the roof above, resulting in areas of green/brown staining on the concrete block wall and sections of exposed and hanging insulation.[4] The rear section of the garage contains shelving, cardboard boxes, and miscellaneous metal and plastic parts bins. In plaintiff's expert's opinion (as defined herein), the subject property is in "below-average" condition, has significant deferred maintenance, and the improvements are near the end of their economic life expectancy.

The subject property is in Montclair's R-A – Redevelopment Area district, as identified under Montclair's Center Gateway Phase I Redevelopment Plan. Permitted uses in the R-A Redevelopment Area district include multi-family dwellings, senior citizen housing, offices (general or business, professional government, and medical), hotels, retail, restaurants, and other

---

[4] During cross-examination, plaintiff's expert testified that in 2016, plaintiff undertook repairs to the roof but did not make repairs to the interior.

   

eating and drinking establishments, educational establishments, health and fitness clubs, art studios and galleries, two-family dwellings, and townhouses. However, due to the subject property's configuration and lot size, it does not meet the minimum lot size, set back, and width requirements for any legally permitted uses in the R-A Redevelopment Area district. Use of the property as a garage pre-dates adoption of Montclair's Center Gateway Phase I Redevelopment Plan and zoning ordinance. Thus, operation of a garage on the property is a legally permitted, pre-existing, non-conforming use. The property is in Flood Hazard Zone X, denoting an area of minimal flooding risk.

During trial plaintiff offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in property valuation. Montclair did not offer any valuation expert testimony. Plaintiff's expert prepared an appraisal report expressing an opinion of the subject property's true or fair market value as of the October 1, 2019 valuation date.

The subject property's local property tax assessment, implied equalized value, and the plaintiff's expert's value conclusion is set forth below:

| Valuation date | Local property tax assessment | Avg. ratio of assessed to true value | Implied equalized value | Plaintiff's expert's value conclusion |
|---|---|---|---|---|
| 10/1/2019 | $353,100 | 89.51% | $394,481 | $255,395 |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of






proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the plaintiff's proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is nonetheless required to determine if the party challenging the tax assessment has overcome the






presumption of validity. If the court concludes that a challenging party has not carried its burden, dismissal of the action is warranted, under R. 4:40-1, and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

Affording plaintiff all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiff produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiff's expert and the facts upon which he relied raise a debatable question regarding the correctness of the subject property's 2020 local property tax assessment.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992).

B.    Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, after considering all legally permitted and physically possible uses allowed in






Montclair's R-A, Redevelopment Area district, plaintiff's expert determined that variance relief would be a prerequisite to developing the property in any manner.[5] Moreover, after considering the financial feasibility of developing the property and what uses would be maximally productive, plaintiff's expert concluded that the subject property's highest and best use, as vacant, is for assemblage with a neighboring property.[6]

In conducting his highest and best use, as improved analysis, plaintiff's expert testified that he considered all legally permitted, physically possible, financially feasible, and maximally productive uses.[7] Observing that the existing use, as improved, is not legally permissible, plaintiff's expert testified that he examined comparable assemblage land sales.[8] However, based on his analysis, no "alternate use . . . would economically justify the removal of the existing improvements." In his opinion, the subject property "has the potential to generate a net cash flow and was designed to meet the expectations of investors." Accordingly, plaintiff's expert concluded that the highest and best use, as improved, was continued use as a "garage facility." The court

---

[5] The subject property is undersized, containing dimensions of approximately 25 feet by 138 feet, or 3,420 square feet. Therefore, plaintiff's expert determined that it does not meet Montclair's minimum lot size or minimum lot width requirements for construction of an office, townhouse, multi-family dwelling, mixed-use, or 2-family residential dwelling."

[6] During cross-examination, plaintiff's expert acknowledged that his appraisal report contains a misstatement regarding his highest and best use, as vacant, analysis. Specifically, plaintiff's expert admitted that the statement in his report that, "various permitted uses meet the first three tests of highest and best use," as vacant, is "wrong, no uses meet the first test."

[7] Plaintiff's expert characterized the subject property's "as improved" use as a "garage facility" and as an "industrial garage facility," which he acknowledged is a non-conforming, pre-existing use." However, based on plaintiff's expert's testimony, the court cannot discern any difference between the two characterizations.

[8] According to plaintiff's expert, although his appraisal report does not identify the comparable land sales analyzed, his work file identifies the five comparable land sales. However, cross-examination revealed that plaintiff's expert did not verify any of the five comparable land sales, nor did he make any adjustments to the comparable land sales. Thus, the court places no weight on plaintiff's expert's testimony regarding the market value of the vacant land sales.






notes that plaintiff's expert's report contained several misstatements regarding his highest and best use analysis and conclusions. However, his trial testimony acknowledged and cured the missteps contained in his report. Accordingly, the court finds, based on plaintiff's expert's trial testimony, that his highest and best use, as vacant, and as improved conclusions are adequately supported by his analysis of Montclair's R-A, Redevelopment Area district, and market forces.

      C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985).

Plaintiff's expert testified that he considered all three approaches to value.[9] However, because the subject property is "typical of properties leased on the open market" and has the

---

[9] Plaintiff's expert testified that he rejected the cost and sales comparison approaches to value due to difficulties in estimating depreciation, entrepreneurial profit, and a lack of available comparable sales data.






capacity to generate positive income, he concluded that the income capitalization approach was the most suitable method to derive an estimate of the subject property's true or market value.

When a property is income producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, LLC v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). See Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 269 (1987) (concluding that "[t]he income method is generally preferred for assessing income-producing property"); TD Bank v. City of Hackensack, 28 N.J. Tax 363, 378 (Tax 2015); Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 578 (Tax 1991).

Here, the court finds plaintiff's expert's use of the income capitalization approach is reasonable and adequately supported.

### 1. Income Capitalization Approach

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." The Appraisal of Real Estate, at 439. See Parkway Village Apartments Co., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270. Market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including






permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-22. The economic or market rent allows an appraiser to accurately forecast the stream of income to be generated and to convert that future benefit into a present value.

### A. Market or economic rent

In performing his income capitalization approach, plaintiff's expert identified six garage facility leases executed between October 2017 and July 2019. The comparable leases are in: (1) Montclair, Essex County; (2) Orange, Essex County; (3) Orange, Essex County; (4) Passaic, Passaic County; (5) Clifton, Passaic County; and (6) Clifton, Passaic County. Plaintiff's expert testified that he verified each of the comparable leases with a "leasing representative." Although plaintiff's expert did not inspect any of the comparable leased properties, in plaintiff's expert's opinion, based on his review of photographs contained in the listings and his discussions with the leasing representatives, the condition of each comparable lease was like the subject property.[10]

The reported unadjusted rents for the six comparable leases ranged from $9.95 to $14.28 per square foot. In plaintiff's expert's opinion, the disparity in unadjusted rents resulted from the leases comprising a mixture of net lease and modified gross lease arrangements.[11] According to plaintiff's expert, modified gross leases are more typical for garage facilities in the marketplace.

---

[10] Plaintiff's expert testified that he conferred with the owner/landlord for comparable lease 6. In addition, the Addendum to plaintiff's expert's report contains the CoStar "Lease Comps Details" report for each comparable lease. The "Lease Comps Details" contain an exterior photo of each leased property and information about the tenant and lease terms. No interior photographs of the comparable leases are in plaintiff's expert's report or its Addendum.

[11] Under a net lease, the landlord is responsible only "for structural maintenance, building reserves, and management" and is reimbursed by the tenant for the real estate taxes and operating expenses attributed to the leased area. The Dictionary of Real Estate Appraisal, at 134. However, under a gross or modified gross lease, the landlord is responsible for the real estate taxes and all or a portion of "the property's operating and fixed expenses." The Dictionary of Real Estate Appraisal, at 91.






Thus, in plaintiff's expert's opinion, the subject property would be leased on a modified gross lease basis. Accordingly, plaintiff's expert applied an upwards adjustment to each of his three comparable leases that were leased on a net basis (lease 2 - $2.61; lease 3 - $3.42; and lease 4 - $1.88), to account for the alleged real estate taxes payable, per square foot. Plaintiff's expert applied no other adjustments to the six comparable leases. The resulting adjusted comparable lease rents ranged from $11.88 to $14.28 per square foot. Plaintiff's expert concluded that the market or economic rent attributable to the subject property should be $14.00 per square foot as of the October 1, 2019 valuation date.

However, cross-examination disclosed shortcomings with respect to plaintiff's expert's investigation of the subject property and the comparable leases. Plaintiff's expert did not have in his possession, nor did he review copies of any of the six comparable lease agreements. Further, plaintiff's expert could not recall whether the subject property had a bathroom, nor was he familiar with whether any of the comparable leased properties contained a bathroom.[12] Plaintiff's expert could not identify the landlord under comparable leases 1, 2, 3, 4, or 5, and did not know if any of the comparable leased properties possessed heat, HVAC systems, or finished office areas. Moreover, plaintiff's expert did not know whether a tenant improvement allowance or rent concession was provided under any of the comparable leases.

As argued by Montclair's counsel, plaintiff's expert's apparent lack of knowledge with respect to these issues raises questions regarding the diligence of plaintiff's expert's investigation. Nonetheless, the court observes that if any of the comparable leased properties possessed a

---

[12] The court highlights that the plaintiff's income and expense statements for the subject property for the calendar years ending 2015, 2016, 2017, 2018, 2019, and 2020 disclose no expenses incurred by plaintiff for water or sewer.






bathroom, heat, HVAC systems, or finished office areas, or the leases afforded a tenant improvement allowance, or rental concession, then a downward adjustment in the reported market rent would have been warranted. This would result in a lower range of adjusted rents and a lower concluded market or economic rent, not a higher market value. Thus, although the court acknowledges that these shortcomings demonstrate plaintiff's expert's lack of a thorough investigation regarding certain factual matters, it does not result, per se, in the wholesale exclusion of plaintiff's expert's opinions and his concluded value. Rather the court must weigh the credible testimony offered by plaintiff's expert against the deficiencies highlighted by Montclair's counsel and discern whether plaintiff has proven, by a fair and reasonable preponderance of the evidence, that the subject property's local property tax assessment is incorrect. See Ford Motor Co., 127 N.J. at 312; WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 617 (App. Div. 1985); Samuel Hird & Sons, 87 N.J. Super. at 75; MSGW Real Estate Fund, LLC, 18 N.J. Tax at 374; Pennwalt Corp. v. Holmdel Twp., 4 N.J. Tax 51, 55-56 (Tax 1982).

Effective cross-examination further disclosed that plaintiff's expert's real estate tax adjustments to comparable leases 2, 3, and 4 were based on the taxes contained in the CoStar "Lease Comps Details" report. Thus, plaintiff's expert failed to independently verify the accuracy of the real estate tax component in computing his adjustments to comparable leases 2, 3, and 4. Cross-examination further disclosed that the CoStar "Lease Comps Details" reports identified "2020" or "2021" as the applicable tax rate for comparable leases 2, 3, and 4, despite the leases bearing 2018 commencement dates. Plaintiff's expert was unable to adequately explain why the property listings did not identify the 2018 or 2019 tax rates, what the 2018 or 2019 tax rates were, why the listings identified "2020" or "2021" as the applicable tax rate, and the accuracy or integrity of the "2020" or "2021" tax rates reported.






Moreover, cross-examination disclosed that the leasing representative with whom plaintiff's expert attempted to verify comparable leases 2 and 3 offered a verification based on his recollection of the transactions and not based on an actual review of his files, the lease, or any written records of the transactions. Additionally, plaintiff's expert did not speak with the "leasing representative" that participated in comparable lease 4, but rather another representative in the office, who lacked any personal knowledge about the lease details. Cross-examination further revealed that the CoStar "Lease Comps Details" report for comparable lease 4 identifies only the "asking rent" and does not identify the effective or starting rent. In sum, plaintiff's expert was unable to confirm the details of comparable leases 2, 3, and 4 reliably and accurately.

It is well-settled that "differences between a comparable property and the subject property are anticipated. They are dealt with by adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). The facts or data relied upon by the expert need not be admissible at trial; nonetheless, the expert's opinions must be rooted in facts, science, data, or the opinions of other experts. N.J.R.E. 703. Thus, the weight to be accorded an expert's opinion "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation (citation omitted). If the bases for the adjustments are not made evident the court cannot extrapolate value." Inmar Associates v. Edison Twp., 2 N.J. Tax 59, 66 (Tax 1980). For the opinion of an expert to be meaningful, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Without an adequate and sound






"explanation as to the basis, the opinion of the expert is entitled to little weight. . . ." Dworman

v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J.

Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)). Hence, the probative value of an

expert's opinion hinges upon not only the similarities and differences that can be drawn between

the properties, but the reliability of the data utilized to support those adjustments.

Here, plaintiff's expert failed to demonstrate the reliability of comparable leases 2, 3, and

4, and to independently confirm the integrity of the tax rate adjustments for comparable leases 2,

3, and 4. Because plaintiff's expert failed to ensure the accuracy of the lease information, as well

as the basis for his net lease adjustments, the court excludes comparable leases 2, 3, and 4 from

consideration in determining market or economic rent.

Despite the missteps revealed during cross-examination, after evaluating all of the evidence

presented during trial, the court is satisfied that plaintiff has offered three comparable leases: (i)

comparable lease 1 ($14.18 psf); (ii) comparable lease 5 ($14.28 psf); and (iii) comparable lease 6

($12.00 psf), as credible evidence of the market or economic rent for a garage facility as of the

October 1, 2019 valuation date. The court emphasizes that comparable lease 1 is in Montclair,

close to the subject property and close to Montclair's central business district. Whereas

comparable leases 5 and 6 are not in Montclair nor Essex County and are not in or close to central

business district locations. Therefore, the court places the greatest weight on comparable lease 1,

and little weight on comparable lease 5 and comparable lease 6. Accordingly, the court concludes

the market or economic rent for the subject property is $14.10 per square foot. The court will

apply the $14.10 concluded market rent to the subject property's 2,275 square foot building area.

B.  Vacancy and Collection Loss

In plaintiff's expert's opinion, garage facilities like the subject property are "very popular,






very easy to fill, [and] fill quickly once vacant." In reaching his concluded vacancy and collection loss factor plaintiff's expert's "primary data source[]" were CoStar market reports. According to plaintiff's expert, in the 3rd quarter of 2019, the vacancy rates reported by CoStar for Essex County Industrial buildings was 3.5%, and for Essex County Industrial 1-3 star rated buildings was 2.5%. Notably, however, for the 3rd quarter 2019, CoStar reports that in the Suburban Essex Industrial submarket, vacancy rates were 1.9%, and in the Suburban Essex Industrial Submarket, 1-3 star rated buildings were 2%.

Here, the subject property is in the Suburban Essex submarket and, according to plaintiff's expert, is classified by CoStar as a 2-star building. Therefore, the court finds the Suburban Essex submarket reports are the most credible evidence of the vacancy rates to be applied to the subject property. Accordingly, the court finds a 2% vacancy and collection loss factor is reasonable and supported by the market data. Therefore, the court will apply a 2% vacancy and collection loss factor to the subject property's potential gross income.

C.     Stabilization

Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic life of the property." First Republic Corp. of America, 16 N.J. Tax at 579 (Tax 1997) (citing The Dictionary of Real Estate Appraisal, at 344-45 (3rd ed. 1993)). Consistent with that principle, under the income capitalization approach, an appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised. The Appraisal of Real Estate, at 453. As part of that analysis an appraiser prepares a reconstructed operating statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." Ibid. Through an examination and analysis of






a property's historical income and expense data, when measured against comparable properties in the market, an appraiser can discern the potential future performance of the property over its economic life.

1.   Operating expenses and reserves

In calculating the subject property's net operating income, plaintiff's expert stabilized and deducted operating expenses for: (i) management fees; (ii) administrative expenses; (iii) maintenance and repairs; (iv) insurance expenses; (v) miscellaneous expenses; and (vi) structural reserves.  According to plaintiff's expert, these "typically" represent the expense categories for garage facility properties.

Plaintiff's expert testified that in determining his stabilized operating expenses, he reviewed plaintiff's actual operating expenses for the subject property for the 2015, 2016, 2017, 2018, 2019, and 2020 tax years.[13]  In plaintiff's expert's opinion, a management fee expense of 5% is "typical" in the marketplace.  In addition, plaintiff's expert offered testimony that an administrative expense of 1%, maintenance and repair expense of 3%, insurance expense of 2.54%, miscellaneous expense of 1%, and structural reserve expense of 2% are reasonable and should be applied to the subject property's potential gross income ("PGI"), not as a percentage of effective gross income ("EGI").  In estimating the subject property's stabilized expenses, he relied on Institute of Real Estate Management (IREM) surveys that, according to plaintiff's expert, compare expenses as a percentage of PGI rather than as a percentage of EGI.[14]  Thus, to be consistent with the published surveys, plaintiff's expert calculated his stabilized expenses as a percentage of PGI.

In general, stabilized operating expenses are computed as a percentage of EGI, not as a

---

[13]  The court notes that the subject property was owner-occupied
[14]  Plaintiff's expert's report does not contain the IREM surveys.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



percentage of PGI. EGI is calculated by "subtracting a vacancy and rent loss allowance" from PGI. Harclay House v. East Orange City, 18 N.J. Tax 564, 569 (Tax 2000) (citing Appraisal Institute, The Appraisal of Real Estate, 482-90 (11th ed. 1996)). The vacancy and collection loss "allowance is usually estimated as a percentage of potential gross income, which varies depending on the type of property and characteristics of the physical property." Pine Plaza Associates, L.L.C. v. Hanover Twp., 16 N.J. Tax 194, 206 (Tax 1996) (citing The Appraisal of Real Estate, at 489).

Thus, EGI "is the anticipated income from all operations of the real property, adjusted for vacancy and collection losses." Harclay House, 18 N.J. Tax at 567, n.1. Under the direct capitalization method,

> an appraiser works down from potential gross income to net operating income. To do this, the appraiser will . . . estimate the potential gross income of the property by adding the rental income and other potential income . . . estimate the vacancy and collection loss . . . subtract vacancy and collection loss from total potential gross income to arrive at the effective gross income of the subject property. . . .
>
> [The Appraisal of Real Estate, at 460.]

In sum, the EGI represents the estimated revenue anticipated to be received by the property owner after accounting for property vacancies and collection losses. "The next step in the income approach analysis is a determination of operating expenses to be deducted from effective gross income. . . ." Pine Plaza Associates, L.L.C., 16 N.J. Tax at 206. "Expenses . . . can be expressed in the same units of comparison used for income, or they can be expressed as a percentage of the effective gross income." The Appraisal of Real Estate, at 468 (emphasis added). Because certain operating expenses like management, utilities, maintenance, structural repairs, insurance, and administrative, are variable, i.e., they fluctuate "with the level of occupancy or the extent of services provided," it would be inappropriate to express them as a percentage of potential gross






income. Id. at 481.  Accordingly, the court concludes that plaintiff's expert's decision to calculate his stabilized operating expenses as a percentage of PGI needlessly overstates the operating expenses that a property owner would incur.  Therefore, the court will stabilize the subject property's operating expenses as a percentage of EGI.

The court finds that the stabilized expenses arrived at by plaintiff's expert for maintenance and repairs, insurance, and reserves, are reasonable and supported by plaintiff's expert's testimony and the subject property's historical operating expenses.  However, the court finds little support in plaintiff's expert's report or the trial record for a 5% management fee, other than plaintiff's expert's subjective opinion, or for the miscellaneous expense of 1%, which plaintiff's expert characterized as a "catch-all."  Plaintiff's expert credibly testified that steady demand exists in the marketplace for garage facilities, and that they remain vacant for only brief periods of time. Plaintiff's expert further stated that "these type of tenants don't care about condition, they want to be able to run their business, these are meat and potato guys, that are plumbers, electricians, those are the types of people that typically lease these garage facilities."  Thus, the court finds that the daily oversight and supervision required for a single-user garage facility, like the subject property, would be minimal.  Consequently, the management fee incurred would be less than an apartment complex, retail stores, or an office building, where a manager is presented with multiple tenants and numerous business invitees and repair personnel entering onto the property daily. Accordingly, the court finds that a 3% management fee is more appropriate for the subject property.  In addition, the court has little testimony or evidence demonstrating what the miscellaneous expense category would account for or why the other expense categories are insufficient to account for expenditures that the property owner would incur.  Therefore, the court will apply the following stabilized expenses, as a percentage of EGI, in determining the subject






property's net operating income: (i) management fee, 3%; (ii) administrative expenses, 1%; (iii) maintenance and repair expense, 3%; (iv) insurance expense, 2.54%; and (v) structural reserves of 2%.

### D. Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, in deriving his capitalization rates, plaintiff's expert reviewed data, including investor surveys and published capitalization rates, in undertaking the Band of Investment technique.[15] The Band of Investment technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)).

Plaintiff's expert examined PwC/Korpacz Real Estate Investor Surveys ("PwC"), American Council of Life Insurers ("ACLI") Investment Bulletins, and Real Estate Research Corporation ("RERC") reports to derive his mortgage interest rate, loan-to-value ratio,

---

[15] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PwC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.






amortization term, and equity dividend rate. In plaintiff's expert's opinion, the capitalization rate which should be applied to the subject property's net operating income is 6.70% (3.75% interest rate, 60% loan-to-value ratio, 25-year amortization term, and 7.50% equity dividend rate).

Based on the court's review and analysis of the referenced surveys, the court finds plaintiff's expert's interest rate and amortization term are reasonable and supported by the data. However, the court finds that a loan-to-value ratio of 70% is more appropriate for the subject property.[16] In addition, the court notes that ACLI data reports equity dividend rates for industrial properties ranging from 4.22% to 8.81% at that time.[17] Accordingly, the court finds that a 7% equity dividend rate is more appropriate.

Accordingly, the court concludes that employing the Band of Investment technique, the calculation of the base capitalization rate would be:

| | | | | |
|---|---|---|---|---|
| Mortgage interest rate | 3.75% | | | |
| Amortization period | 25 years | | | |
| Mortgage constant | 6.17% | | | |
| Mortgage component | 70% | x | 6.17% = | 4.32% |
| Equity divided rate | 7.00% | | | |
| Equity component | 30% | x | 7.00% = | 2.10% |
| | | | | 6.42% |

Therefore, the court concludes that a base capitalization rate of 6.42% should be applied as of the October 1, 2019 valuation date. However, because the subject property is being valued under a modified gross lease arrangement, after determining the base capitalization rate, a tax

---

[16] Although plaintiff's expert testified that he did not rely on it, the Realtyrates.com survey data contained in the addendum to his appraisal report reflects that the "average" loan-to-value ratio for "industrial – all types" properties in the 3rd quarter of 2019 is 70.2%.

[17] The discount rate or internal rate of return reported by PwC in the National Warehouse Market averaged 6.13% in the 3rd quarter of 2019. The court emphasizes that discount rates and equity dividend rates are not identical, however, the discount rate offers a glimpse of the annualized return that an investor was receiving at that time.






factor must be "loaded" or added to the base capitalization rate to derive an overall capitalization rate. The tax factor represents the real estate taxes payable by plaintiff. Here, plaintiff's expert opined that Montclair's effective tax rate is 3.241%, for the 2020 tax year. However, the court's review of Montclair's tax rate for the 2020 tax year reveals that an effective tax rate of 2.845% is correct.[18] Thus, the overall capitalization rate to be applied to the subject property's net operating income is 9.265% (6.42% + 2.845% = 9.265%), as of the October 1, 2019 valuation date.

Therefore, calculation of the subject property's net operating income is as follows:

**2019 Tax Year**

INCOME:

| | | | |
|---|---|---|---:|
| Garage | $14.10 p.s.f. | @ 2,275 sq. ft. | $32,078 |
| TOTAL: | POTENTIAL GROSS INCOME | | $32,078 |

| | | |
|---|---|---:|
| LESS: Vacancy & Collection Loss | @ 2% PGI | ($ 642) |
| TOTAL: | EFFECTIVE GROSS INCOME | $31,436 |

STABILIZED EXPENSES:

| | | | |
|---|---|---:|---:|
| Management Fees | @ 3% of EGI | $ 943 | |
| Maintenance & Repair Expenses | @ 3% of EGI | $ 943 | |
| Administrative Expenses | @ 1% of EGI | $ 314 | |
| Insurance Expenses | @ 2.54% of EGI | $ 798 | |
| Structural Reserves | @ 2% of EGI | $ 629 | |
| TOTAL: EXPENSES | | ($3,627) | |

| | |
|---|---:|
| NET OPERATING INCOME | $27,809 |

Applying the capitalization rate to the subject property's net operating income results in a rounded value of $300,200 ($27,809/.09265 = $300,151). Accordingly, the court finds the true or fair market value of the subject property to be $300,200 as of the October 1, 2019 valuation date.

---

[18] Montclair's 2020 tax rate is $3.179 and its average ratio of assessed to true value is 89.51%. Thus, the mathematical equation is: $3.179 x .8951 = 2.845%.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



2. Corrected local property tax assessment

Having reached a conclusion of the subject property's true or fair market value, the court will turn its attention to determining the correct assessment for the 2020 tax year. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| true market value | x | average ratio | = | revised taxable value |
|---|---|---|---|---|

For the 2020 tax year, the ratio of assessed value, $353,100, to true market value, $300,200, yields a ratio of 1.18% ($353,100/$300,200 = 1.18%), which exceeds the upper limit of Montclair's Chapter 123 common level range. Consequently, the subject property's tax assessment calculation for the 2020 tax year is:

$300,200     x     .8951 =     $268,700 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2020 will be entered as follows:

| | |
|---|---|
| Land | $205,100 |
| Improvement | $ 63,600 |
| Total | $268,700 |






Contemporaneously with the issuance of this opinion, the court is entering the above-referenced judgment.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




